Daniel D. GARCIA, Appellant,

v.

The STATE of Texas, Appellee.

No. 04–02–00351–CR.

Court of Appeals of Texas,
San Antonio.

June 23, 2004.

Rehearing Overruled Sept. 22, 2004.

Discretionary Review Granted
Jan. 26, 2005.

Discretionary Review Refused
Jan. 26, 2005.

David L. Botsford, Law Office of David
L. Botsford, Austin, George Scharmen,
San Antonio, for appellee.

Scott Roberts, Asst. Criminal Dist. Atty., San Antonio, for appellee.

Sitting: CATHERINE STONE, Justice, PAUL W. GREEN, Justice, KAREN ANGELINI, Justice.

## OPINION

Opinion by KAREN ANGELINI, Justice.

Daniel D. Garcia was convicted of murdering his wife and was sentenced to ninety-nine years imprisonment. On appeal, Garcia brings sixty-five issues. Because Garcia's tenth issue has merit, we reverse the judgment of the trial court and remand the cause to the trial court for proceedings consistent with this opinion.

### BACKGROUND

In December 1993, Lesa and Daniel "Danny" Garcia met through a dating service. Six months later, Danny moved into Lesa's home and in January 1995, Lesa and Danny married. At the end of that year, they moved into a new home on Falcon Oak Drive in San Antonio, Texas. On May 15, 1996, Lesa and Danny's first child, Daniel, was born. Throughout the next year, 1997, Lesa and Danny sought marriage counseling from Mary Torres. On August 27, 1997, Lesa and Danny's second child, Ian, was born. Ian had significant medical problems that caused stress in Lesa and Danny's marriage.

Another stress in their marriage was Danny's wish to move to his parent's property. Danny's parents, Sally Garcia and Dr. Daniel Garcia, owned a home located on twenty-five acres near Leon Springs, Texas, just northwest of San Antonio. The Garcia family referred to these twenty-five acres as the "family compound." Sally and Daniel Garcia had allocated each of their three children five acres on which to build a home. Lesa and Danny walked the property and cleared three separate building sites. Lesa, however, was reluctant to move onto the family compound, afraid that it would give Danny too much leverage in the event of a divorce.

On Sunday May 24, 1998, Lesa, Danny, and their two small children went to the family compound for dinner at Danny's parent's home. That evening, on the way home from the family dinner, Danny and Lesa argued in the car about moving to the family compound. Danny stopped the car on Loop 1604 and forced Lesa out of the car. He then drove away. Lesa walked about two miles to a grocery store and called her sister, Laura Jacobs, to pick her up. Lesa then spent the night at her sister's home. Five days later, Lesa reported the incident to Officer Marquin of the San Antonio Police Department. Because of the incident, Lesa and Danny separated for two and a half months, reconciling in August 1998. Danny and Lesa continued to undergo marriage counseling. They stopped seeing Mary Wells and began seeing Father Tom Picton at the Catholic Counseling Center. When Father Picton retired, they began seeing Dr. Richard Theis.

On July 29, 1999, Lesa and Danny went to an appointment with Dr. Theis. During this session, the "car dumping" incident of May 1998 was discussed. According to Dr. Theis, the "car dumping" incident was a recurring theme of discussion during the counseling sessions. During the July 29th session, the topic of divorce was broached, at which time Danny shook his finger at Lesa and said that divorce was not an option. Dr. Theis understood Danny's statement to be a reminder to Lesa of her devout Catholic beliefs. Also during the session, Danny admitted that he could become physical with Lesa if she pushed him. According to Dr. Theis, Danny stated that "everyone has their breaking point and

that if Lesa nagged and nagged him, [] he could become physical with her." Dr. Theis assumed Danny's statement meant the end of the marriage. The following morning, Dr. Theis called Lesa and recommended that she file for divorce. He also recommended that she obtain counsel and a protective order.

On August 6, 1999, Lesa hired Sara Hermann as her attorney. Plans were made to serve Danny on the evening of August 9, 1999, Lesa's birthday. At approximately 6:45 p.m. on August 9th, Mitchell Cromwell served Danny with divorce papers. Cromwell informed Danny that the divorce papers included a court order ordering Danny to vacate the home by 9:00 p.m. that same evening. According to Cromwell, Danny responded by stating, "That bitch will pay." Danny called his father, Dr. Daniel Garcia, for help moving his belongings. Shortly before the 9:00 p.m. deadline, Danny and his father finished loading Danny's belongings onto a flatbed trailer, and they arrived at the family compound after 9:00 p.m. According to Danny's family, he was not angry with Lesa that evening, but was sad that they were divorcing.

The next day, Lesa hired a locksmith to re-key her home. She also began communicating with Danny through emails. From August 1999 to February 2000, they communicated primarily via email. According to Danny, he wanted to communicate via email because he did not trust Lesa and wanted a record of their discussions. On August 21, 1999, Lesa had the alarm system in her home repaired and entered a new code to arm and disarm the system.

Lesa and Danny worked together regarding visitation of their children. At this time, Danny was about three and a half years old, and Ian was two years old. According to Danny, he would pick up his two children on Wednesday afternoons at day care and return them Thursday mornings. And on his weekends, he would pick them up on Friday evenings at day care and return them to day care on Monday mornings. The State, however, presented evidence that Danny would not return the children to day care on Monday mornings, but would instead return them to Lesa at the Falcon Oak residence on Sunday night.

In an attempt to avoid hefty legal fees, Lesa and Danny were also working on a divorce settlement. On November 5, 1999, Danny's attorney, Bob Estrada, sent Lesa's attorney, Sara Hermann, a proposed divorce decree and property settlement reflecting the terms and conditions agreed to by Lesa and Danny. By early January 2000, Hermann had not responded to the proposed decree. Estrada sent discovery to Hermann and set trial for February 17, 2000. Hermann responded by seeking discovery of Danny's retirement/brokerage account. On February 17, 2000, Lesa, Danny, Sara Hermann, and Bob Estrada met in a jury room at the Bexar County Courthouse, attempting to settle the divorce and property division. Hermann demanded $7500 of the approximately $100,000 that was in Danny's brokerage account. According to Hermann, there had been some commingling of community funds. Danny and Estrada refused the demand. Estrada then exited the room because of a prior case held over from the day before. After Estrada left, Hermann praised both Lesa and Danny for setting their differences aside and working things out amicably. Because of the other case, Estrada entered and then exited the room several times. Danny became agitated with his attorney's behavior and asked Hermann if Estrada's behavior was appropriate. Hermann replied that it was not. Hermann and Lesa then exited the room, at which time Lesa told Her-

mann that Danny was getting upset and that she was afraid of him again. When they entered the room, Danny, for the first time, offered to work less and take custody of the boys. Danny and Hermann then left to find Estrada. After finding Estrada in a courtroom, they reset the case for February 23, 2000.

On Friday February 18, 2000, Lesa called Danny and asked to have the boys for the weekend. Danny refused, saying that it was his weekend. Lesa then asked if Danny would take the boys to a birthday party on Saturday. According to Danny, he refused because he already had plans to take the boys to a family wedding on Saturday. Laura Ellison, Lesa's co-worker, heard Lesa's portion of the phone call. According to Ellison, Lesa was upset because she thought it was her weekend to have the boys and because Danny refused to take the boys to the birthday party.

Also on Friday February 18th, Danny fired Estrada as his divorce attorney and hired Elizabeth Lindell. Later that Friday, Danny picked the boys up at day care and took them to his mobile home on the family compound.[1] On Saturday, Danny had planned to take the boys to the family wedding, but Danny's plans changed when Daniel, the eldest boy, got sick and soiled his dress clothes. Instead, Danny and the boys spent the day at the family compound.

On Sunday, February 20, 2000, Danny took the boys to Brackenridge Park, returning to the family compound before 6:00 p.m. for the traditional family dinner. Several members of the Garcia family were present for the family dinner: (1) Danny, (2) his two boys, (3) Danny's parents, Sally Garcia and Dr. Daniel Garcia, (4) Danny's sister, Cathy Garcia, and her husband Dr. Louis Garcia, (5) Danny's oth-

er sister, Debbie Sigoloff, Debbie's husband, Nelson Sigoloff, and their son, Sam Sigoloff, and (6) Ben Hicks, a friend of Sam Sigoloff. Sam Sigoloff and Ben Hicks, both teenagers, were going to camp on the family compound with Brian Sigoloff, Sam's cousin. At dinner, the boys' camping plans were discussed. After dinner, at approximately 8:30 p.m., Nelson, Debbie, Sam, and Ben left Sally and Dr. Daniel Garcia's home for their home, also situated on the family compound. Danny and his two boys also left for the mobile home. According to Danny, when he left his parents' home, he was carrying Ian, his youngest son, in his left arm, holding the children's diaper bag in his right hand, and walking with Daniel. As Danny approached the corner of the mobile home closest to his parents' home, he put Ian down on the ground. His knee gave way and he tripped on something and fell backward and to his right, hitting the ground with the back, right side of his right hand. Danny believes that he either tripped on the trenches that had been dug for the sewer, electrical, and water connections for the mobile home or on rough hill country terrain. Danny testified that as a result of the fall, he bruised his right hand.

After he entered the mobile home, Danny took off his long-sleeved sweatshirt and bathed his children. According to Danny, when he was picking Daniel up out of the bathtub, he lost control of Daniel who started to slide. Daniel then grabbed for Danny's neck and scratched Danny's chest.

Also around 8:30 p.m., Dr. Louis Garcia left the home to rent a movie for the family.

Around 9:00 p.m., Lesa's next door neighbor, Lamerie Sheffield, saw Lesa in her back yard watering her lawn.

---

1. After Lesa and Danny separated for the second time, Danny bought a mobile home and placed it on the family compound near his parents' home.

At about 9:30 p.m., Dr. Louis Garcia returned to Sally and Dr. Daniel Garcia's home with the video rental. Sam Sigoloff and Ben Hicks had taken sleeping bags out to the campsite behind the Sigoloff home [2] and some distance away from the mobile home. Sam Sigoloff saw some headlights coming into the family compound and believed it was his "Uncle Louis" returning with the movie. Around 11:00 p.m., Brian Sigoloff arrived at the Sigoloff home. All three teenage boys, Brian, Sam, and Ben, went to the campsite for the night.

Around 1:00 a.m., the family finished watching the movie. Cathy and Dr. Louis Garcia left Sally and Dr. Daniel Garcia's home. The Garcia family home has a "dinger," a hose that runs across the drive at the front gate. When a car runs over the "dinger," a loud bell sounds in the Garcia home. The purpose of the "dinger" is to indicate when someone enters the family compound. Neither Sally nor Dr. Daniel Garcia heard the dinger ring after 1:00 a.m.

Sometime in the middle of the night, Ben Hicks saw some car headlights enter the property and go over to Danny's mobile home. Ben Hicks testified that he heard a car door open and close. Ben asked Sam, "Who is it?" According to Ben, Sam replied, "Oh, it's just my uncle." Ben believed that he saw the headlights around 3:00 a.m. However, Ben was not wearing a watch; he was estimating the time based on his own belief. Neither Sam Sigoloff nor Brian Sigoloff saw these headlights heading to Danny's mobile home. They did not hear Danny's pick-up truck that night, nor did they hear car doors opening and closing. Moreover, Sam and Brian testified that all three boys had been drinking beer that night at the campsite. Although Ben Hicks admitted

that he had drunk beer before at the campsite, he denied drinking beer on that occasion.

At around 7:30 a.m. on Monday, February 21, 2000, Danny dropped off his two sons at daycare. He gave the boys their breakfast and then filled out the medication sheet for the daycare workers. Danny, an engineer, then left for work.

That same morning, Patricia Bach, one of Lesa's friends and co-workers, called Lesa at work. Lesa was not there. Bach called the daycare and was told that Lesa's boys were present. Bach then drove over to Lesa's house to check on her. When Patricia arrived, she noticed that Lesa's red Suburban was "backed in" the driveway. The exterior lights to the house and the soaker hoses were still on. She rang the doorbell, but no one responded. Patricia walked around to the back of Lesa's house, and looked into a window. She saw Lesa's purse sitting on the kitchen counter, but did not see Lesa. Patricia then walked back to the front of the house and felt the hood of the Suburban. The hood was cool to the touch. Patricia then drove home and called Lesa's employer, suggesting that the employer contact Lesa's stepfather, Ken Cadena.

Someone at Lesa's place of work contacted Ken Cadena. Ken obtained the keys to Lesa's house and accompanied by his secretary, drove to Lesa's house. Like Patricia, Ken noticed that the Suburban had been backed in. Ken thought this was unusual as Lesa did not usually park her car in that manner. Ken placed a key in the top bolt lock, but could not remember if the door was locked or not. He then inserted the same key into the button lock on the door knob and opened the front door. When the door opened, the alarm

**2.** The Sigoloff home is also situated on the family compound.

began sounding. Ken could not disable the alarm. He then saw Lesa's body, only covered by a shirt, lying just inside the front door at the foot of the stairs. Surrounding her body were sheets and a pillow.

The first police officer on the scene, Officer Hernandez, quickly ascertained that there had been no forced entry. Many other officers, detectives, and technicians arrived. Lesa's partially nude body was videotaped and photographed. Her hands were bagged for DNA analysis. Lesa's head was soaked with blood. Upstairs, there were blood splatters on the wall behind the bed in the master bedroom. Spots of blood in the carpet led from the master bedroom down the stairs to Lesa's body.

Around 1:00 p.m., Detective Raymond Roberts, the lead detective, arrived on the scene. He spent a short amount of time downstairs, but did not go upstairs. He then met with Ken Cadena next door at Lamerie Sheffield's residence. After speaking with Cadena, Detective Roberts, accompanied by Detective Gonzalez, drove to the family compound. When they arrived, Sally Garcia and Dr. Daniel Garcia, alerted by the "dinger," met them outside. Roberts and Gonzalez informed the Garcias that Lesa had been killed and that they needed to talk with Danny. Sally called Danny at his work and then put Gonzalez on the telephone. Gonzalez identified himself as a homicide investigator and obtained directions to Danny's work. Gonzalez and Roberts then left for Danny's work.

Shortly thereafter, Danny called his mother back and asked what was happening. Sally told Danny to wait for the officers because they needed to talk to him. At approximately 3:30 p.m., Detectives Gonzalez and Roberts arrived at Danny's work. Danny met the detectives and showed them to a conference room. According to the detectives, Danny was relaxed and nonchalant. Because Danny's shirt was not buttoned all the way to the top, Detective Roberts noticed two scratches below his adam's apple on his neck. Danny was cooperative, but seemed unconcerned with the situation. He was not nervous. According to Detective Roberts, in an attempt to get an emotional response from Danny, he said, "Your fucking wife is dead." Danny did not respond emotionally. Danny agreed to accompany the detectives downtown for questioning. He locked his office. When he came back downstairs to meet the detectives, the top button on his shirt was buttoned.

Danny accompanied the detectives downtown for questioning. He denied killing Lesa. Dr. Daniel Garcia, Nelson Sigoloff, and Dr. Louis Garcia arrived at the police station. Dr. Daniel Garcia obtained permission to speak with Danny. Danny gave his father his keys to his pick-up truck, which was still parked at his workplace. Dr. Daniel Garcia, Nelson Sigoloff, and Dr. Louis Garcia left to get Danny's truck and drive it back to the family compound.

When asked about the scratches on his neck, Danny said that he was playing with his kids and one of them scratched him. The detective then obtained a search warrant to photograph Danny and get blood, hair, and DNA samples. Around 8:30 p.m., Detectives Roberts and Gonzalez took Danny to a hospital. After arriving at the hospital, the detectives, for the first time, noticed bruising on Danny's right hand. According to Detective Roberts, during questioning, Danny had his hands in his lap. And, Danny was not the type of person to speak using his hands. Photographs of the scratches on Danny's neck

and his bruised right hand were taken.[3]

On February 22, 2000, an autopsy was performed on Lesa. According to Dr. Jan Garavaglia, a combination of strangulation and blunt head trauma caused Lesa's death.

### LEGAL SUFFICIENCY OF THE EVIDENCE

■ In his first three issues, Appellant Daniel Garcia ("Danny") argues that the evidence is legally insufficient to support his conviction. In doing so, Danny argues that legal insufficiency must be measured under the reasonable hypothesis of guilt analytical construct which pre-existed *Geesa v. State*, 820 S.W.2d 154 (Tex.Crim.App. 1991). We disagree.

■ Under the reasonable hypothesis of guilt analytical construct, the State in circumstantial evidence cases had to exclude all reasonable hypotheses, other than the defendant's guilt, in order for the evidence to be legally sufficient. *See Geesa v. State*, 820 S.W.2d 154, 161 (Tex.Crim.App.1991). In *Geesa v. State*, 820 S.W.2d 154, 161–62 (Tex.Crim.App.1991), the court disregarded the reasonable hypothesis of guilt analytical construct all together, holding that the construct was inappropriate both as a jury instruction and as a standard of review. *Geesa*, however, did explain that the abrogation of the reasonable hypothesis of guilt analytical construct necessitated a jury instruction on reasonable doubt. *Id.* at 161. Nine years later, the court of criminal appeals overruled that portion of *Geesa* which required trial courts to instruct juries on the definition of "beyond a

reasonable doubt." *Paulson v. State*, 28 S.W.3d 570, 573 (Tex.Crim.App.2000).

■ Danny argues that we should interpret *Paulson* as a return to the pre-*Geesa* standard of review. We decline to do so. The *Paulson* court specifically limited its decision to that portion of *Geesa* which required trial courts to instruct juries on the definition of "beyond a reasonable doubt." *See id.* at 573. The court of criminal appeals did not mention that portion of *Geesa* providing for the abrogation of the reasonable hypothesis of guilt analytical construct. Moreover, since *Paulson*, the court of criminal appeals has reiterated the correct standard of review in circumstantial evidence cases:

> In conducting a legal sufficiency review, this Court examines all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. This standard is the same in both direct and circumstantial evidence cases.

*Burden v. State*, 55 S.W.3d 608, 612–13 (Tex.Crim.App.2001) (citations omitted). We, therefore, will apply the standard of review reiterated by the court of criminal appeals in *Burden*.[4]

Using the standard of review most recently reiterated by the court of criminal appeals in *Burden*, we hold that the evidence is legally sufficient. Danny was convicted of murdering Lesa. *See* TEX. PEN. CODE ANN. § 19.02 (Vernon 1994). Here, Danny does not dispute that Lesa was murdered; he disputes that he was the

---

3. The testimony at trial showed that Danny is left-handed.

4. Danny also argues that because the trial court denied his request for a definition of reasonable doubt and gave an inaccurate definition of reasonable doubt, he is entitled to appellate review of his legal sufficiency claims

utilizing the reasonable hypothesis of guilt analytical construct or the federal standard employed in circumstantial evidence cases. We decline to do so. We will instead apply the standard of review dictated by the Texas Court of Criminal Appeals.

person who murdered her. The evidence, however, is legally sufficient to support his conviction. Danny had scratches on his chest. DNA found underneath Lesa's fingernails was consistent with a mixture of Lesa's and Danny's DNA. And, there was testimony that the bruising on Lesa's fingers was consistent with her fighting her attacker. Lesa's body was beaten and bruised. Danny's right hand was also bruised. And, according to the State's experts, the injury to Danny's hand was consistent with him striking an object or a person. It was not consistent with Danny falling down. Finally, Ben Hicks testified that in the middle of the night, he saw headlights come into the family compound and head to Danny's trailer. And, when he asked Sam Sigoloff who was coming in, Sam responded, "Oh, it's just my uncle." Examining all the evidence in the light most favorable to the verdict, we hold that any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.

## THE "CAR DUMPING" INCIDENT

In his tenth issue, Danny argues that the trial court abused its discretion in overruling his objections and allowing the State to introduce evidence of the "car dumping" incident in violation of Texas Rules of Evidence 401, 403, and 404(b).

In its case-in-chief, the State elicited testimony about the "car dumping" incident through three witnesses: Dr. Richard Theis, Laura Jacobs, and Joan Wells. Additionally, during the defense's case-in-chief, the State elicited testimony about the incident on cross-examination of Danny and his mother, Sally Garcia.[5]

Danny and Lesa saw Dr. Richard Theis for marriage counseling. At trial, Dr. Theis testified that Danny and Lesa began seeing him in May of 1998 as a result of the "car dumping" incident:

Q: Had there been an event that precipitated them coming to see you back in May of 1998?

A: Yes.

Q: And what was that event?

A: they—Lesa termed it the car dumping. And the best of my recollection is that they were on, I believe [Loop] 1604, and Danny had forced Lesa out of the car. And there [were] some bruises on Lesa. And as—I think as a result of that, primarily, they were not living together at the time. They had seen a therapist prior to me at the Catholic Consultation Center, Father Tom Picton, and it was informed to me [sic] that they were not satisfied with their progress so they switched therapists to me.

Q: Did the defendant ever take responsibility for that car dumping incident?

A: He admitted that he did it.... Danny took responsibility for it. But he never took full responsibility for that incident.

Q: Did he, in fact, blame Lesa partially for that incident?

A: Partially.

Q: And was that a recurring theme in the counseling?

A: Yes ... Not every session, but it was brought up numerous times.

Laura Jacobs, Lesa's sister, also testified about the "car dumping" incident.

---

**5.** Danny preserved error with respect to all of these witnesses by obtaining a running objection to any testimony regarding the "car dumping" incident. Specifically, Danny argued that any testimony regarding the "car dumping" was inadmissible pursuant to Texas Rules of Evidence 401, 403, and 404(b).

Laura testified that she received a phone call from Lesa between 10:00 p.m. and 11:00 p.m. on the Sunday of Memorial Day weekend in May of 1998. According to Laura, Lesa was upset and crying. Laura then testified about what Lesa had told her that night:

Q: And what did Lesa tell you happened?

A: She told me that she was returning home from a visit to Daniel's parents and had argued with Daniel, and ... [s]he said that the argument deteriorated and that Daniel told her to shut—to shut the fuck up, or he would kick her out of the truck.

Q: When—Did she tell you the children were in the car or not?

A: Yes. The children were in the truck with them.

Q: And what did she tell you happened?

A: Well, evidently things couldn't quiet down, so he pulled off of 1604 just past the Hausman exit, and shoved her out of the truck.

Q: And did she describe to you how that happened?

A: She—Yes, she did. She said that he pulled the car over, and brought it to a stop and reached over and opened the door, and shoved her out the door, but met resistance because her safety belt was still on. He shoved for a few minutes—well, not a few minutes, but it was a few seconds before he realized this, and unlatched her belt and continued to shove her until she fell out of the door without her purse. She was begging for her purse or a cell phone. This was a summer evening, she was in shorts and sandals and had nothing with her. And he dumped her on the side of the road and took off. Actually, the door was still open when he took off.

Laura then testified that Lesa walked 1.8 miles to a grocery store. Lesa called Laura from the grocery store. When Laura arrived at the grocery store, Lesa was "obviously very, very upset. She just was shaken and didn't know what to do." Lesa then spent the night at Laura's home. Laura testified that Danny did not call to check on Lesa that night nor the next morning. Lesa and Danny then separated for the first time.

Joan Wells is a licensed counselor specializing in abusive relationships. She testified that Lesa was her client. She saw Lesa four times between June of 1998 and July of 1998. Joan Wells testified that Lesa came to see her following the "car dumping" incident and that she and Lesa discussed the incident. According to Wells, she was very concerned about Lesa's safety and although she normally did not call her clients at home, she made an exception for Lesa because of her concern for Lesa's safety.

Additionally, Danny was cross-examined by the State about the "car dumping" incident:

Q: You've heard testimony about when you pushed Lesa out of the car on 1604, haven't you?

A: Yes, I have.

Ms. Skinner: May I approach the witness?

The Court: You may.

Q: I show you what's been marked as State's Exhibit Number 94. You've seen this before, haven't you?

A: No. I haven't actually read it, I've heard about it.

Q: Defense attorney never showed you that, and went over that with you?

A: No. I haven't read this report at all.

Q: But you are aware that Lesa did make a police report, documenting what happened when you pushed her out of the car on 1604?

A: Yes. I'm aware that she made a police report.

Q: And she documented it because she didn't trust you, or what you would do in the future?

A: I can't say for certain what she documented.

Q: And that's not what it says in the police report?

A: I don't know what the police report says. I haven't read it.

Q: Let's talk about the car dumping.

A: Okay.

Q: The children were in the car when you told Lesa to shut her fucking mouth or you were going to throw her out of the car. Isn't that true?

A: No, that's not.

Q: The children were in the car?

A: Yes. But I didn't say that.

Q: Okay. So you're denying that you did tell Lesa to shut her fucking mouth?

A: I didn't say that.

Q: So Laura Jacobs was lying when she testified to that, that that's what Lesa told her?

A: She wasn't there.

Q: But so Lesa was lying when she told Laura that?

A: Possibly.

Q: Well, if you didn't say it, then Lesa would be lying about it?

A: Apparently.

* * *

Q: You were very angry, weren't you, when you were driving home that night with Lesa and the kids?

A: Yes, I did. I became very angry.

Q: Okay. And you pulled off 1604?

A: I stopped at 1604, yes.

Q: And you slammed on the brakes?

A: Yes. I stopped, slamming on my brakes, yes.

Q: And you reached across Lesa, and you opened the door, and you started to try to push her out of the car, didn't you?

A: Yes. I think so.

Q: And you—You think so or you did?

A: No. I had to unbuckle her seat belt. She still had her seat belt.

Q: Right. You unbuckled her seat belt, even though she's begging you to stop?

A: Yeah.

Q: And you pushed her out of the car onto the side of the road, where she fell down?

A: No. I actually pushed her hip.

Q: And she just fell out by herself, then?

A: No. She got out.

Q: Lesa got out?

A: With my assistance, yes.

Q: You pushed her out of the car, didn't you?

A: Well, you can't really push a person out of the car with one hand. But, yes, I did push her.

Q: And you left her on the ground?

A: Well, she was standing when I left.

Q: She fell to the ground?

A: Not to my knowledge. She was standing.

Q: She was hurt, wasn't she?

A: I don't know.

Q: You don't know because you drove off and you didn't come back for her?

A: That's right.

Q: You didn't even know if she was all right, did you?

A: I found out she was all right the next day.

Q: Yeah, because you didn't call her that night. You didn't check with any of her family or friends to see if she was okay?

A: I didn't know where she was.

Q: You didn't care, did you?

A: I was concerned about where she was, but not—

Q: You're telling us that you were concerned about where she was, and you left her on the road off of 1604?

A: I figured that she was going to walk home.

Q: You think she deserved it, don't you?

A: No—Well, no. Not really.

Q: Not really?

A: No.

Q: You think she was to blame for it.

A: Well, she threatened me.

Q: When Detective Roberts asked you at the police station if there was any physical violence—

A: Yes.

Q: —in yours and Lesa's relationship—

A: Yes.

Q: —you denied it, didn't you?

A: Yes, I did.

Q: And you certainly didn't tell him about this incident, did you?

A: I don't recall if I did or not.

Q: So you lied to Detective Roberts when he asked you about physical violence?

A: I didn't hit her.

Q: And you don't call pushing somebody out of the car onto the ground physical violence?

A: It could be—Yeah, if you do it roughly enough, yes.

Q: And you minimized this whole incident with your family, didn't you?

A: No. I told them that I pushed her out of the car.

Q: When your mother found out about it, you told her that you stopped the car very calmly and Lesa got out of the car, isn't that true?

A: I don't think so.

Q: So you didn't give your mother that information?

A: No. I told her that I put Lesa out of the car.

Q: Did you tell her you stopped the car very calmly?

A: I don't recall that exact terminology, no.

Q: The fact is, you lost your temper, didn't you?

A: Yes, I did.

Q: And you admitted that in the counseling session, didn't you?

A: Yes, I did.

Q: You separated right after that incident?

A: Yes. Lesa requested that I move out of the house, and I did so.

Finally, the State elicited testimony about the "car dumping" incident during its cross-examination of Danny's mother, Sally Garcia:

Q: Do you think in May of 1998, when Danny and Lesa had an argument, he very calmly stopped the car and Lesa got out, isn't that true?

A: Would you say that again?

Q: Okay. You believe that in May of 1998, when Lesa and Danny had an argument after they had left your house, and argument in the car, that he very calmly stopped the car on 1604 and Lesa got out?

A: Yes. I know of that incident.

Q: Okay. And that's what you believe happened?

A: Yes.

Q: That he very calmly stopped the car and Lesa—

A: Very calmly? Is that what you're saying, very calmly?

Q: Uh-huh.

A: I have—I don't have any idea how calmly he stopped the car. I'm sorry.

Q: And you believe that Lesa got out of that car, don't you?

A: Yes. I believe that she got out of the car, but I wasn't there.

Q: But that's—that's based on what your son told you?

A: Yes.

Q: And do you recall testifying in a previous court testimony regarding that incident, that he was very calm, and she got out of the car? Do you recall that?

A: I recall a previous hearing where I testified to that same incident.

*Ms. Skinner:* May I approach the witness?

*The Court:* You may.

Q: Let me show you what's been marked as State's Exhibit 96. This is a transcript of your testimony. And regarding that question regarding the prior incident in May of 1999, if you'll look here, if this was your response. He was very calm and she got out of the car. Is that correct?

A: That is correct. If—If it's in there, it's correct, I guess.

Q: Okay. And you think that your son showed great restraint in not being provoked to hit her, isn't that true?

A: That I remember distinctly, yes.

Q: So you believe that he showed great restraint by not being provoked to hit her?

A: I feel that he showed great restraint to stop and not escalate the incident.

Q: And you don't really know what happened out there in May of 1998, other than what your son told you, is that not true?

A: That's correct.

Q: And you don't want to believe that your son could be violent, and violently push Lesa out of the car and leave her on the side of the road, do you?

A: I don't think my son is violent.

Q: Do you think your son pushed Lesa out of the car, in front of the children, left her on 1604 between ten and eleven at night, without any money, or a cell phone, or a purse, and she had to walk over—about a mile-and-a-half? Do you believe that?

A: Do I believe the incident happened? Or—

Q: Do you believe that he pushed her out of the car in front of the kids and left her on the side of the road?

A: I believe he stopped the car, she got out, and the children were asleep in their little car seats in the car. That's what I believe.

Q: Lesa got out on her own accord?

A: She was—you mean, standing up when she got out of the car?

Q: That she got out by herself. That your son did not push her out of the car.

A: That, I couldn't tell you. I wasn't there.

Q: And you think the children were sleeping, if there was yelling and arguing going on?

A: I don't know there was yelling or arguing going on. I never heard them yell or argue.

### A. Extraneous Offenses—Rule 404(b)

■ The general rule is that a defendant may not be tried for being a criminal generally. *See Couret v. State,* 792 S.W.2d 106, 107 (Tex.Crim.App.1990). Evidence of other crimes, wrongs, or acts of a defendant is not admissible, unless it is relevant to prove a material issue other than the character of the defendant. *See* TEX.R. EVID. 404(b); *Couret,* 792 S.W.2d at 107. Rule 404(b) provides that such evidence may be admissible as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. TEX.R. EVID. 404(b). Extraneous offense evidence may also be admissible for the purpose of rebutting a defensive theory. *See* TEX.R. EVID. 404(a)(1)(A); *Wheeler v. State,* 67 S.W.3d 879, 886–87 (Tex.Crim.App.2002).

According to Danny, the trial court abused its discretion in permitting the State to introduce any evidence relating to the "car dumping" incident because the purpose of introducing the evidence was to show that Danny had a violent character and acted in conformity on the night Lesa was murdered. In response, the State argues that the evidence has non-character conformity purposes: to prove motive, intent, and the nature of the relationship between Danny and Lesa. Article 38.36(a) provides,

In all prosecutions for murder, the State or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

TEX.CODE CRIM. PROC. ANN. art. 38.36(a) (Vernon Supp.2004). Thus, the State argues that the "car dumping" incident is admissible under article 38.36(a) to show the nature of the relationship between Danny and Lesa. However, in *Smith v. State,* 5 S.W.3d 673, 679 (Tex.Crim.App. 1999), the court of criminal appeals held that "evidence admissible under article 38.36(a) may be nevertheless excluded under rule 404(b) or rule 403." As such, if a defendant makes a timely 404(b) or 403 objection, before a trial court can properly admit the evidence under article 38.36(a), it must first find that the non-character conformity purpose for which it is proffered is relevant to a material issue. *Id.* If relevant to a material issue, the trial court must then determine whether the evidence should nevertheless be excluded because its probative value is substantially outweighed by the factors in rule 403. *Id.*

■ Thus, we must first determine whether evidence relating to the "car dumping" incident is admissible under rule 404(b), i.e. the non-character conformity purpose for which it is proffered is relevant to a material issue. We review the trial court's rulings concerning the admissibility of evidence of other crimes, wrongs, or acts under an abuse of discretion standard. *Montgomery v. State,* 810 S.W.2d 372, 387, 391 (Tex.Crim.App.1991). As long as the trial court's ruling was within the zone of reasonable disagreement, we will not interfere with the ruling. *Id.*

The State argues that the non-character conformity purposes of the car-dumping incident are to show Danny's motive and

intent (state of mind).[6] The State presents its argument as follows:

> The fact that the appellant, in an angry confrontation, shoved the victim out of the truck and drove off leaving her stranded on Loop 1604 on a previous occasion, shows that he had a reason for and an intent to inflict harm on the victim. It shows that appellant harbored ill-will and dangerous anger with regard to the victim. In discussing this event, appellant himself admitted to his therapist that the victim's nagging causes him to reach a "breaking point." The evidence helps the jury to understand that appellant harbored dangerous anger and ill-will toward the victim. As will be discussed subsequently, the victim was afraid of the appellant and the victim's office was also afraid of the appellant and had procured a restraining [order] to keep him from the premises where she was employed. The couple's counselor offered testimony that he was very concerned for the victim's safety from the appellant. Ms. Joan Wells testified that the Loop 1604 incident is a very disturbing incident of domestic violence which would cause all kinds of red flags to go up in her mind. This evidence is relevant to appellant's motive, anger toward the victim, and intent, the intention to do physical violence to the victim.

Reading this analysis by the State, it seems apparent that the "car dumping" incident had no other purpose than to show conformity, i.e. that Danny was a violent man who acted violently on the date in question.

 Indeed, looking at the State's first proffered purpose, the "car dumping" incident does not show Danny's motive to murder Lesa two years later. While proof of motive is not a required element in criminal cases, it is always relevant and admissible to prove that the accused committed the offense. *Crane v. State,* 786 S.W.2d 338, 349–50 (Tex.Crim.App.1990). For evidence to be admissible as proof of motive, it must tend to raise an inference that the accused had a motive to commit the alleged offense for which he is on trial. *Bush v. State,* 628 S.W.2d 441, 444 (Tex. Crim.App.1982); *Rodriguez v. State,* 486 S.W.2d 355, 358 (Tex.Crim.App.1972). For example, in *DeLeon v. State,* 937 S.W.2d 129, 135 (Tex.App.-Waco 1996, pet. ref'd), the fact that the defendant was driving a stolen car was admissible to show that he feared being arrested. Escaping arrest was his motive for attacking the police officer who had stopped him for speeding. Here, however, there was no evidence that the "car-dumping" incident was Danny's motive for killing Lesa. Instead, the purpose of the "car dumping" incident was to show that Danny had been allegedly violent toward Lesa two years ago and thus, was likely violent toward her on the night she died.

The State also contends that the "car dumping" incident shows Danny's general ill-will and anger towards Lesa. In *Foy v. State,* 593 S.W.2d 707, 708 (Tex.Crim.App. 1980) (panel op.), the defendant was convicted of arson. On the night of November 15, 1976, Mearleon Dugar and her daughter saw their neighbor, the defendant, throw a burning object through the bedroom window of their home. *Id.* Over objection, the State was allowed to elicit testimony from Mrs. Dugar and her husband that on October 27, 1976, approximately three weeks before the date of the offense, the defendant pointed a pistol at

---

6. The State also argues that the car-dumping incident shows the nature of Lesa and Danny's relationship pursuant to article 38.36(a). However, as noted above, the evidence must not violate rules 404(b) and 403 before it can be admissible under article 38.36(a).

the couple and threatened them as they were leaving a shopping area. *Id.* Mrs. Dugar also testified that in the early part of November, the defendant came to the front door of her home, pointed a pistol at her and her son, and threatened them. *Id.* The court of criminal appeals held that this evidence of the extraneous offenses was admissible because it was probative of the defendant's motive for committing arson. *Id.* According to the court, "these prior violent acts indicated the existence of hostility or ill will on the part of [the defendant] toward the victims of the offense charged." *Id.* at 709. The court then stated, "[u]nder these circumstances, the evidence of prior extraneous offenses should be admissible as circumstantial evidence of the existence of motive for committing the offense charged." *Id.*

*Foy,* however, is distinguishable from the facts presented here. In *Foy,* the defendant committed extraneous acts close in time to the offense which were probative of his motive for committing the offense. Here, Danny got into an argument with his wife over familial matters. He then stopped the car and pushed her out. Two years then passed during which time Danny and Lesa separated, reconciled, and then separated again. The "car dumping" incident is simply not probative of Danny's motive to murder Lesa. It does show that two years before Lesa's murder, Danny was angry with her. However, that fact alone cannot make the "car dumping" incident admissible under rule 404(b). The State's interpretation would eviscerate rule 404(b). Under the State's interpretation, any extraneous act showing general ill will toward the victim would be admissible. In fact, the extraneous offense must be probative of the defendant's motive to commit the offense. An extraneous offense that merely shows general ill will cannot alone be sufficient. Otherwise, the court of criminal appeals would not have held that

evidence under article 38.36 must still pass rule 404(b) muster. *See Smith,* 5 S.W.3d at 679. Here, the "car dumping" incident shows general ill will on one occasion. It simply is not probative of Danny's motive to murder Lesa two years later.

■ Similarly, the State's other proffered purpose, intent, was not relevant to a *material* issue. *Id.* Intent was not a material issue in this case. No one disputed that Lesa was intentionally killed; Danny disputed that it was he who killed her. Indeed, intent was easily inferred from the crime itself. Extraneous offense evidence would be admissible to demonstrate intent if intent could not be inferred easily from the conduct itself. *See Montgomery v. State,* 810 S.W.2d 372, 392 (Tex.Crim.App. 1991). For example, if a defendant was accused of intentionally not paying for merchandise, evidence of numerous prior instances in which the defendant failed to pay for goods received on credit would be admissible to prove his intent to steal in the current transaction. *See Plante v. State,* 692 S.W.2d 487, 493–94 (Tex.Crim. App.1985). Or, a defendant charged with indecency with a child might claim that he unintentionally touched the girl's genital area when he swung her up on his shoulder. Evidence of other occasions in which he had similarly fondled neighborhood children would be admissible to show that his conduct was intentional and not accidental. *See Morgan v. State,* 692 S.W.2d 877, 882 (Tex.Crim.App.1985). Here, however, intent is easily inferred from the crime itself. Intent simply was not a material issue in this case.

The State also makes the general statement that "evidence of prior quarrels and/or prior acts of violence between the victim and the defendant are relevant to the issues of motive and intent." The cases cited by the State for support, how-

ever, are distinguishable from the facts presented here. In *Hernandez v. State*, 914 S.W.2d 226, 233 (Tex.App.-Waco 1996, no pet.), the defendant was accused of murdering a baby girl by hitting her in the stomach. The court held that evidence that he had hit the baby in the stomach two weeks before she died was probative of his intent. *Id.* Here, not only is the "car-dumping" incident not similar to the crime at issue, but the incident occurred *two years* before Lesa's death.

In *Simpson v. State*, 975 S.W.2d 364 (Tex.App.-Waco 1998, no pet.), Melody Simpson was accused of committing aggravated assault with a deadly weapon by stabbing her ex-boyfriend, Geronimo Dehoyas several times. Less than two months before the attack, Simpson kicked in Dehoyas's back door because he' would not let her into his home. *Id.* at 366. Dehoyas was forced to call the police who escorted Simpson from the home. *Id.* And, five days before the commission of the charged offense, Simpson came to Dehoyas's home again. The police were again called to escort her from Dehoyas's home. *Id.* The court held that evidence of these two incidents was probative of Simpson's motive and intent:

> The fact that Simpson has repeatedly forced herself into Dehoyas's home and refused to accept the end of the relationship, leaving only when forced out by the police, shows that she had reason for and a purpose in attacking Dehoyas. This evidence helps the jury understand Simpson's infatuation with Dehoyas and her increasing anger and anxiety over

the fact that he no longer wanted to have a relationship with her.

*Id.* at 367. Here, the "car-dumping" incident is not probative of Danny's purpose in attacking Lesa. It was two years before Lesa's death during which time Danny and Lesa separated, reconciled, and then separated again.[7]

The State also cites *Williams v. State*, 927 S.W.2d 752 (Tex.App.-El Paso 1996, pet. ref'd). Unlike here, in *Williams*, 927 S.W.2d at 758, intent and state of mind was a material issue because the defendant asserted that the victim was the aggressor in the altercation and because whether the defendant shot the victim while acting under the immediate influence of sudden passion arising from an adequate cause was a material issue. Also, unlike here, evidence that the defendant had physically assaulted the victim on numerous occasions and had threatened her was probative because it showed an ongoing course of violent conduct toward the victim. *Id.* There is no such showing of an ongoing course of violent conduct in this case. As such, we find the cases cited by the State to be distinguishable and unpersuasive.

Not only was the "car dumping" incident not probative of Danny's motive and intent, but it also was not proper rebuttal evidence under rule 404(a)(1)(A). Rule 404(a)(1)(A) provides that evidence of a pertinent character trait may be offered by an accused in a criminal case or by the prosecution to rebut same. The State introduced the "car dumping" evidence in its case-in-chief. At the time of its introduction, the State had nothing to rebut.[8] The

---

**7.** For these same reasons *Sattiewhite v. State*, 786 S.W.2d 271 (Tex.Crim.App.1989), also cited by the State, is distinguishable. In *Sattiewhite*, the defendant killed his ex-girlfriend in a public parking lot by shooting her with a gun. Evidence that in the ten days before the shooting the defendant had twice held a shot-

gun to the victim's head while threatening to "blow her brains out" was probative of the defendant's motive to murder her. *Id.* at 284.

**8.** The defense mentioned the "car dumping" incident in its opening statement, but it did so

defense in its case-in-chief introduced evidence of Danny's peaceable nature, but it did so only to rebut the State's introduction of the "car dumping" incident.

Because the "car dumping" evidence was not probative of Danny's motive or intent nor did it rebut a defensive theory, the trial court abused its discretion in admitting the evidence. We must, therefore, now determine whether the trial court's error was harmful.

## B. Harm

 Erroneously admitted extraneous offense evidence does not constitute constitutional error. *Avila v. State*, 18 S.W.3d 736, 741 (Tex.App.-San Antonio 2000, no pet.). Therefore, we apply Texas Rule of Appellate Procedure 44.2(b). Rule 44.2(b) provides that any error, other than constitutional error, "that does not affect substantial rights must be disregarded." Tex.R.App. P. 44.2(b); *Burnett v. State*, 88 S.W.3d 633, 637 (Tex.Crim.App.2002). For claims of non-constitutional error, "a conviction should not be overturned unless, after examining the record as a whole, a court concludes that an error may have had 'substantial influence' on the outcome of the proceeding." *Burnett*, 88 S.W.3d at 637. Put another way, if we have "a grave doubt" that the result was free from the substantial influence of the error, then we must treat the error as if it did. *Id.* "Grave doubt" means that "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id.* at 637–38. Thus, "in cases of grave doubt as to harmlessness the petitioner must win." *Id.* at 638.

Indeed, in this case, we have grave doubt that the result was free from the substantial influence of the error. The "car dumping" incident was emphasized and reiterated by the State through several witnesses. This was not an incident that was discussed briefly at trial. It was discussed in depth, over and over again. The State emphasized the incident to such a degree that it was the crux of the State's closing argument:

> There are two Daniel Garcias. There is one that his family knows, and there is one that Lesa knew. The one Lesa knew was a completely different person than the one his family knew. The one Lesa knew, she met back in May of 1998 at the incident on 1604.

> You remember the testimony of his family members, when they were asked about the incident. You remember the testimony of his mother, because, you see, she got her version of events from the Danny Garcia that she knows. There is a Danny Garcia for that side of the room, and then there's the Danny Garcia that Lesa knew.

> The one Lesa knew, Doctor Theis got a look at in late July of 1999. And what Doctor Theis saw at that counseling session alarmed him so much that the very next day, the first thing in the morning, he called Lesa, he checked on whether she was all right. He recommended she get a divorce and a protective order. And Doctor Theis is a trained professional. He is in the business of marriage counseling. But he got a glimpse of the real Daniel Garcia in late July of 1999.

> And I want you to keep in mind, ladies and gentlemen, that the Danny Garcia that Lesa knew, she was afraid of. Because when he went off like he did on 1604 two years before her death, it frightened her. It frightened her enough that she went to see Joan Wells and talk to her about putting together a

only to rebut the State's remarks in its open-

ing statement about the incident.

safety plan. And Joan Wells is a counselor for women that have been abused. Okay. Lesa tried. Lesa did not want to give up on the marriage. Even though she had seen the real Danny Garcia, she had—

> *Botsford:* Your Honor, I'm going to object, because the only—she went to that woman before the 1604 incident, Your Honor. I object, it's a misstatement of the evidence, and it's asking the jury to speculate.

> *Court:* Ladies and Gentlemen, you remember the testimony.

*State:* She went to see Joan Wells after the 1604 incident. She went to see Mary Torres before the 1604 incident. If I say anything during my argument, ladies and gentlemen, that does not comport with your memory of the testimony, that is your memory of the testimony, of course, that will rule the day.

Okay. Mary Torres was the counselor that the defendant and she went to starting in '97 with the stressors about the birth of their second son so close after the—you know, the two little ones. And then Joan Wells was the one that she went to see after the 1604 incident, without the defendant. Okay?

They separated after the 1604 incident, but she wants to make it work. She's got two little kids, and she wants to make it work. . . .

Given the emphasis placed on the "car dumping" incident throughout the entire trial, we cannot say that the incident did not impress upon the jury the notion that Danny acted in conformity with his character, an impression the law seeks to avoid. *See* Tex.R. Evid. 402. Moreover, this was

a circumstantial evidence case. Evidence of Danny's guilt was not overwhelming. Although Danny had scratches to his chest and a bruised hand, he offered an innocent explanation for those injuries. And, experts at trial agreed that Lesa's fingernail could have picked up Danny's DNA through innocent means.[9] After a conscientious examination of the record, we are left with "grave doubt" that the result was free from the substantial influence of the error. *Burnett*, 88 S.W.3d at 638. We, therefore, find that the introduction of the extraneous offense was harmful and, with respect to rule 404(b), sustain Danny's tenth issue.

### C. *Rule 403*

■■■■■ Danny also argues that the "car dumping" incident should have been excluded pursuant to Texas Rule of Evidence 403. We agree. Even if the "car dumping" incident was admissible under rule 404(b), it still should have been excluded under rule 403. Rule 403 excludes relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Tex.R. Evid. 403. Extraneous offense evidence, which is relevant beyond proof of character conformity, is presumed admissible subject to exclusion under rule 403 only if the opponent of the evidence timely objects and demonstrates that the danger of unfair prejudice substantially outweighs its probative value. *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex.Crim.App.1991). We should not engage in a *de novo* review of the record in order to determine whether the probative

---

**9.** The jury was instructed that it should only consider the "car dumping" incident as evidence of Danny's motive and intent to kill Lesa. As we have discussed, the "car dumping" incident was not probative for these two purposes. It is unlikely that the jury disregarded the "car dumping" evidence altogether. It likely followed the trial court's instruction and erroneously considered the incident as evidence of Danny's motive and intent.

value of the extraneous act is substantially outweighed by the danger of unfair prejudice. *Id.* at 392. In conducting our review, we review for abuse of discretion and measure the trial court's ruling against the relevant criteria by which a rule 403 decision is to be made. *Id.*

Relevant criteria include whether the ultimate issue was seriously contested by the opponent; whether the State had other convincing evidence to establish the ultimate issue to which the extraneous conduct was relevant; whether the probative value of the misconduct evidence was not, either alone or in combination with other evidence, particularly compelling; and whether the misconduct was of such a nature that a jury instruction to disregard it for any but its proffered purpose would not likely have been efficacious. *Id.* at 392–93. Under this approach, we determine the admissibility of extraneous offense evidence by reviewing not only the relevance of that evidence, but the State's need for it as well. *Id.* at 392.

■■■ Applying this criteria to the issue of intent, evidence of extraneous acts is admissible to prove scienter, where intent is an essential element of the State's case and cannot be inferred from the act itself. *See id.* Here, however, intent was readily inferred from the act itself. The State had no need to prove intent; intent was readily inferred and not disputed. Assuming that the "car dumping" incident had probative value, it was of little probative value. And, the "car dumping" was so emphasized at trial and of such a prejudicial nature that the trial court's jury instruction was likely not effective.

As for motive, motive was contested by Danny. However, the State had other convincing evidence to establish motive: the disagreement Danny and Lesa had at the courthouse the Thursday before the murder, the fact that the divorce was not finalized, that Danny asked for custody for the first time, that Danny did not want to give Lesa money from his retirement account, and that Lesa and Danny argued about who should have had the kids the weekend of the murder. And, assuming the evidence of the "car dumping" incident was probative, it had little probative value. Finally, as noted above, it is unlikely the trial court's instruction was effective. We, therefore, hold that the trial court abused its discretion in allowing evidence of the "car dumping" to be admitted. And for the same reasons noted above, we hold that the error is harmful.

### CONCLUSION

The trial court committed harmful error in allowing the State to introduce evidence of the "car dumping" incident in violation of rule 404(b). And, even if the incident was admissible under rule 404(b), the trial court committed harmful error in allowing the State to introduce evidence of the incident in violation of rule 403. Thus, we reverse the judgment of the trial court and remand this cause to the trial court for further proceedings consistent with this opinion.