Daniel D. GARCIA, Appellant,

v.

The STATE of Texas, Appellee.

No. 04–02–00351–CR.

Court of Appeals of Texas, San Antonio.

Oct. 10, 2007.

Rehearing Overruled Jan. 3, 2008.

---

David L. Botsford, The Law Office of David L. Botsford, Austin, TX, George Scharmen, San Antonio, TX, for Appellant.

Scott Roberts, Assistant Criminal District Attorney, San Antonio, TX, for Appellee.

Sitting: CATHERINE STONE, Justice, KAREN ANGELINI, Justice, and REBECCA SIMMONS, Justice.

## OPINION

Opinion by KAREN ANGELINI, Justice.

Daniel D. Garcia was convicted of murdering his wife, Lesa Garcia, and was sentenced to ninety-nine years imprisonment. He appealed, bringing sixty-five issues. In our initial opinion, we reached four issues: (1) we overruled his first three issues, finding that the evidence was legally sufficient to support his conviction; and (2) we sustained his tenth issue, holding that the trial court abused its discretion in overruling his objections and allowing the State to introduce evidence of the "car dumping" incident in violation of Texas Rules of Evidence 401, 403, and 404(b). Having sustained Garcia's tenth issue, we reversed the trial court's judgment and remanded the cause for a new trial. The State appealed, and the Texas Court of Criminal Appeals determined that the evi-

dence related to the "car-dumping" incident was properly admitted at trial. *See Garcia v. State*, 201 S.W.3d 695 (Tex.Crim. App.2006), *cert. denied*, — U.S. ——, 127 S.Ct. 1289, 167 L.Ed.2d 106 (2007). Therefore, the court of criminal appeals reversed the judgment of this court and remanded the cause for further consideration of the remaining issues. We now reach Garcia's remaining sixty-one issues.

## FACTUAL BACKGROUND

A complete and lengthy statement of facts was presented in our initial opinion. *See Garcia v. State*, 150 S.W.3d 598, 600–05 (Tex.App.-San Antonio 2004), *rev'd*, 201 S.W.3d 695 (Tex.Crim.App.2006), *cert. denied*, — U.S. ——, 127 S.Ct. 1289, 167 L.Ed.2d 106 (2007).

## FACTUAL SUFFICIENCY

■ In his fourth issue, Garcia [1] argues that the evidence is factually insufficient to support his conviction. In conducting a factual sufficiency review, we view "all the evidence without the prism of 'in the light most favorable to the prosecution' and set[ ] aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. State*, 958 S.W.2d 404, 407 (Tex.Crim.App.1997) (quoting *Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim. App.1996)); *see also Watson v. State*, 204 S.W.3d 404, 414 (Tex.Crim.App.2006) (explaining that the "basic ground rules for post-*Clewis* factual-sufficiency review are well articulated in *Cain v. State* "). In doing so, we must "be mindful that a jury has already passed on the facts, and convicted, and that the court should never order a new trial simply because it disagrees with the verdict, but only where it seems to the court to represent a manifest

injustice, though supported by legally sufficient evidence." *Watson*, 204 S.W.3d at 414. The factual-sufficiency analysis can be broken down into two prongs. *Id.* "The first prong asks whether the evidence introduced to support the verdict, though legally sufficient, is nevertheless 'so weak' that the jury's verdict seems 'clearly wrong and manifestly unjust.' " *Id.* at 414–15. "The second prong asks whether, considering conflicting evidence, the jury's verdict, though legally sufficient, is nevertheless against the great weight and preponderance of the evidence." *Id.* at 415.

■ In arguing that the evidence is legally insufficient, Garcia points to the lack of a motive, a lack of opportunity, a lack of proof as to who actually caused Lesa Garcia's death, an inadequate investigation, and evidence of an alibi. First, Garcia argues that the State's theory of motive "is nothing but pure, unmitigated speculation unsupported by the evidence." We disagree. The evidence shows that, on the Thursday before her murder, Lesa Garcia demanded $7,500 out of Garcia's brokerage account, which was valued at approximately $100,000, and which, according to the State's argument, infuriated Garcia. The evidence further shows that Garcia responded by raising, for the first time, the issue of wanting primary custody of the children. According to the State, in making this demand, Garcia intended to retaliate against Lesa Garcia's demand for more money. The State's theory was that after thinking about Lesa Garcia's demand all weekend, Garcia became angry and ultimately caused Lesa's death on Sunday night.

Second, Garcia argues that he lacked an opportunity to murder Lesa Garcia, emphasizing that the only evidence of him

1. Appellant Daniel D. Garcia will be referred to as Garcia throughout this opinion. To avoid confusion, Lesa Garcia will be referred to by her full name.

leaving the family compound on Sunday night comes from the testimony of Ben Hicks. Garcia points out that neither Sam Sigoloff nor Brian Sigoloff saw the headlights that Ben Hicks testified he saw around 3:00 a.m. However, while Sam and Ben Sigoloff are relatives of Garcia, Ben Hicks is not related to either Garcia or Lesa Garcia. And, Ben Hicks was adamant that at about 3:00 a.m. on the night in question, he saw the headlights of a vehicle entering the family compound and going over to Garcia's mobile home. After he heard a car door open and close, he asked his friend Sam Sigoloff, "Who is it?" According to Hicks, Sam Sigoloff replied, "Oh, it's just my uncle."

Third, Garcia argues that there is a lack of proof as to who actually killed Lesa Garcia. Garcia contends that although there was no evidence of sexual trauma to Lesa Garcia, Dr. Jan Garavaglia, the doctor who performed the autopsy, testified that she could not rule out consensual intercourse with a condom. Garcia emphasizes that condoms were found in Lesa Garcia's night stand and that Lesa Garcia was on her bed when she was hit with an object that caused blood to splatter on the wall. Thus, Garcia urges that a third party with whom Lesa Garcia had a sexual relationship could have been the murderer. And, Garcia contends that his own DNA was found under Lesa Garcia's fingernails because he had previously lived at the home. Thus, her nails could have picked up his DNA by touching something that contained a previously deposited source of his DNA. Additionally, while Garcia admits that his hand was bruised and there were scratches on his chest, he argues that the condition of Lesa Garcia's hands show that she fought hard for life. Thus, according to Garcia, if he had been the assailant, he should have had more defensive wounds on his body. And, he argues that the marks on his chest were consistent with his child scratching him.

Garcia, however, minimizes the evidence of his DNA being found underneath Lesa Garcia's fingernails, the substantial bruising on his hand consistent with his hitting someone, and the substantial scratches on his chest. While it is true that all this evidence is circumstantial, it is still consistent with his causing the death of Lesa Garcia.

Fourth, Garcia argues that the police did not conduct an adequate investigation. We disagree. The State presented numerous witnesses who detailed the crime scene investigation. The testimony of these witnesses showed that evidence was collected and documented, including DNA evidence and fingerprint evidence. The scene was photographed and videotaped. Lesa Garcia's home was noted as very tidy and clean; nothing appeared to be out of place. And, despite the home being very tidy, a plastic bag containing the children's dirty clothes was lying on the kitchen counter. None of the doors or windows showed any evidence of a forced entry. In conducting the investigation, the police interviewed many witnesses. Therefore, in reviewing the appellate record, we believe that the police conducted a thorough investigation.

Fifth, Garcia points to his alibi evidence. He contends that from 8:30 p.m., when he left the family dinner to walk to his mobile home, to 1:00 a.m., the "dinger" sounded only once: when Dr. Louis Garcia returned to the main house after renting a video. At 1:00 a.m., the "dinger" sounded again: when Dr. Louis Garcia and his wife left the family compound. Garcia emphasizes that the "dinger" did not sound again until 7:15 a.m., when he left the family compound to take his children to daycare. However, there was evidence that Garcia could have moved the "dinger" to prevent it from sounding and alerting those sleep-

ing in the main house. And, Ben Hicks testified that he saw the headlights of a vehicle entering the family compound at 3:00 a.m., heading toward Garcia's trailer.

In reviewing the record, we hold that the evidence is factually sufficient.

### OTHER ISSUES RELATED TO THE "CAR DUMPING" INCIDENT

In issues five through nine, Garcia argues that the trial court erred by (1) giving the jury a limiting instruction during the trial and later in the charge that it could consider the "car dumping" incident in determining Garcia's intent; (2) overruling Garcia's requested limiting instruction that omitted the word "misconduct" and substituted the words "other act"; and (3) overruling Garcia's objection to the use of the words "act of misconduct" contained in the limiting instruction given in the charge.

In his supplemental brief, Garcia points out that in its opinion the court of criminal appeals held that the "car dumping" incident was not admissible to show motive or intent but instead held that it was admissible under article 38.26(a) "for the purpose of illustrating the nature of the relationship" between him and Lesa Garcia. However, Garcia emphasizes that the jury was not instructed that it could consider the "car dumping" incident for the purpose of illustrating the nature of their relationship. Instead, it was instructed that it could consider the "car dumping" incident for the purpose of showing Garcia's motive or intent. Thus, Garcia contends he was harmed by such an erroneous instruction.

In our first opinion, we held that the "car dumping" incident was not admissible under Texas Rule of Evidence 404(b) because it was not probative of Garcia's mo-

tive or intent and because it did not rebut a defensive theory. *See Garcia*, 150 S.W.3d at 614–15. In its opinion, the court of criminal appeals did not disagree with this holding,[2] but instead emphasized that the "other purposes" listed as examples in rule 404(b) was not an exhaustive list. *Garcia*, 201 S.W.3d at 703. Thus, it explained that "in cases in which the prior relationship between the victim and the accused is a material issue, illustrating the nature of the relationship may be the purpose for which evidence of prior bad acts will be admissible." *Id.* It then held that because the "car dumping incident was relevant to circumstances surrounding [Lesa and Danny Garcia's] relationship immediately preceding the murder, i.e., that they had separated, attempted to reconcile, and sought marriage counseling, but instead were in the process of divorcing," the car dumping incident was "admissible under rule 404(b) for the purpose of illustrating the nature of their relationship." *Id.* at 703–04.

The court of criminal appeals then considered whether the probative value of this evidence was substantially outweighed by the danger of unfair prejudice under rule 403. *Id.* at 704. In holding that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, the court reasoned that "there is no reason for us to believe that the jury had reasonable doubt that [Garcia] murdered Lesa but convicted him anyway based on the evidence of the car dumping incident." *Id.* It further reasoned that "any potential prejudice was diminished by the trial court's limiting instruction and instruction to disregard." *Id.*

---

**2.** Indeed, the court of criminal appeals states that because Garcia "did not put intent at issue through means such as presentation of defense theories or vigorous cross-examina-

tion," the "car dumping" incident was inadmissible under rule 404(b) for the purpose of showing Garcia's intent. *See Garcia*, 201 S.W.3d at 704.

We are bound by the majority's holdings. In its opinion, the court of criminal appeals explained that the "car dumping" incident was not probative of Garcia's intent or motive. *Garcia*, 201 S.W.3d at 703–04. Thus, we believe the trial court should not have instructed the jury that it could consider the incident for purposes of intent and motive. And, we believe that, by giving such an erroneous instruction, the trial court exacerbated the prejudicial impact of the evidence, instructing the jury to "consider the evidence for impermissible character-conformity purposes in the false guise of 'intent' or 'motive.'" *Id.* at 707 (Price, J., dissenting). Thus, we believe that the trial court erred and Garcia was harmed as a result. However, the court of criminal appeals has explicitly stated that the limiting instruction at issue was a reason why "any potential prejudice was diminished." *Id.* at 704. As stated above, we are bound by this holding and therefore must overrule Garcia's issues five through nine.

In issues eleven and twelve, Garcia argues that by allowing evidence of the "car dumping" incident, the trial court violated his right to due process as guaranteed by the Constitution and his right to due course of law as guaranteed by the Texas Constitution. Specifically, in his brief Garcia argues that the admission of evidence can constitute a due process and due course of law violation and contends that the "essential question is whether the *evidentiary error* denied the defendant a fundamentally fair trial." Here, however, the court of criminal appeals has held that the "car dumping" incident was not erroneously admitted. *See Garcia*, 201 S.W.3d at 704. Thus, there is no evidentiary *error* that denied Garcia a fundamentally fair trial. We overrule issues eleven and twelve.

In his thirteenth issue, Garcia argues that "the zone of reasonable disagreement standard employed by the courts of Texas is inconsistent with that mandated by the Supreme Court when reviewing evidentiary rulings in criminal cases under the Federal Rules of Evidence, upon which the Texas Rules of Evidence are based." In this issue, Garcia seems to be arguing that Texas courts are erroneously applying the abuse of discretion standard to evidentiary rulings. This standard, however, is well-established, *see Montgomery v. State*, 810 S.W.2d 372, 387, 391 (Tex.Crim.App.1991), and any change in the standard of review should be left to our highest state court in criminal matters, the court of criminal appeals. We, therefore, overrule Garcia's thirteenth issue.

### TESTIMONY ABOUT LESA GARCIA BEING AFRAID

In issues fourteen through sixteen, Garcia argues that the trial court erred by overruling his objections to testimony that Lesa Garcia was afraid of him. According to Garcia, the hearsay statements made by Lesa Garcia to the witnesses who testified were not admissible under Texas Rule of Evidence 803(3), were not relevant under rule 401, were subject to exclusion under rule 403, and violated his constitutional right to confrontation and cross-examination.

Specifically, Garcia complains of the following three witnesses' testimony: Patricia Bach, a co-worker and close friend of Lesa Garcia's; Mary Pruski, also a co-worker and close friend of Lesa Garcia's; and Sara Herrmann, Lesa Garcia's divorce attorney. Bach testified that Lesa Garcia "expressed fear of her husband" "several times." Pruski testified that during the period of time in which Lesa Garcia was serving Garcia with divorce papers, Lesa Garcia "was petrified. She was really,

really scared." According to Pruski, "I had to really convince [Lesa] to even come to dinner, because she really didn't want to put me at risk, and she felt like she might." Pruski testified that when Lesa Garcia arrived, "she was really nervous and upset." Pruski also testified that July 30, 1999, she talked to Dr. Richard Theis and after talking to him "went to see if Lesa was okay." According to Pruski, Lesa Garcia "was scared, petrified, shocked, [and] very, very upset." Pruski also testified that on the Friday before Lesa Garcia was murdered, Lesa talked to her about her meeting with Garcia at the courthouse. According to Pruski, Lesa Garcia "teared up a couple of times," "was very upset," and "was scared." Herrmann, Lesa Garcia's divorce attorney, testified that on the Thursday before the murder, after the conference at the courthouse with Garcia, Lesa Garcia told her that she was "afraid of Danny again."

■ First, Garcia argues that these statements were not admissible under rule 803(3)'s state-of-mind hearsay exception. We disagree. Rule 803(3) provides that a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health)" is not excluded by the hearsay rule even though the declarant is available as a witness. TEX.R. EVID. 803(3). Texas courts have held that the type of statement contemplated by this rule includes a statement that on its face expresses or exemplifies the declarant's state of mind—such as fear, hate, love, and pain. *See Martinez v. State,* 17 S.W.3d 677, 688 (Tex.Crim.App. 2000); *Cardenas v. State,* 115 S.W.3d 54, 62–63 (Tex.App.-San Antonio 2003, no pet.). "Thus, a victim's statement regarding her emotional response to a particular person qualifies as a statement of then existing state of emotion under rule

803(3)." *Cardenas,* 115 S.W.3d at 63; *see also Martinez,* 17 S.W.3d at 688 (holding trial court did not err in admitting the victim's statement that she was afraid of the man with the same first name as defendant because the statement was admissible under rule 803(3)). Similarly, here, the statements made by Lesa Garcia went to her then existing state of mind. *See Cardenas,* 115 S.W.3d at 63 (holding that trial court did not err in admitting under rule 803(3) witnesses' testimony regarding the victim's statement that the defendant "was making her uncomfortable").

■ Second, Garcia argues that Lesa Garcia's statements that she was afraid of him were not relevant under rule 401. However, the court of criminal appeals held in its opinion that evidence concerning the circumstances surrounding the relationship between Lesa and Danny Garcia is relevant under article 38.36(a) of the Texas Code of Criminal Procedure. *See Garcia,* 201 S.W.3d at 703–04 (explaining that the "car dumping" incident was "relevant to circumstances surrounding their relationship immediately preceding the murder, i.e., that they had separated, attempted to reconcile, and sought marriage counseling, but instead were in the process of divorcing"). Therefore, we find that her statements about being afraid were relevant.

■ Third, Garcia argues that the admission of Lesa's statements about being afraid violated rule 403. In overruling Garcia's rule 403 objection, the trial court noted that from opening statement, the jury had been told that "there was a dicey relationship between the defendant and the complainant." Thus, the trial court did not believe that "there's going to be any confusion of issues." We agree. "The purpose in excluding relevant evidence under rule 403 is to prevent a jury that has a reasonable doubt of the defendant's guilt

in the charged offense from convicting him anyway based solely on his criminal character or because he is generally a bad person." *Garcia*, 201 S.W.3d at 704. Here, we see no such danger. *Cf. id.* (holding that admission of the "car dumping" incident did not violate rule 403 because "there is no reason for us to believe that the jury had reasonable doubt that appellant murdered Lesa but convicted him anyway based on the evidence of the car dumping incident"). We therefore hold that the probative value of the evidence was not *substantially outweighed* by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

Fourth, Garcia argues that the admission of the statements that Lesa Garcia was afraid violated his constitutional right to confrontation and cross-examination. In his brief on the merits, Garcia argues that these statements elicited by the State "were pure hearsay and not grounded in any firmly rooted hearsay exception." Since the time Garcia filed his brief, however, the Supreme Court decided *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

▮▮ Before *Crawford* was decided, the scope of a defendant's Confrontation Clause rights was delineated by *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), which conditioned the admissibility of all hearsay evidence on whether it fell under a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." Under this test, a hearsay statement was *per se* reliable under the Confrontation Clause if it fell within a "firmly rooted" exception to the hearsay rule. *Guidry v. State*, 9 S.W.3d 133, 149 (Tex.Crim.App.1999). *Crawford*, however, abrogated *Roberts*. Under *Crawford*, the admission of testimonial hearsay violates the Confrontation Clause unless the declarant is shown to be unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354. Thus, the threshold question here is whether Lesa Garcia's statements about being afraid were testimonial or non-testimonial in nature. *See id.*

Although the Court in *Crawford* left "for another day any effort to spell out a comprehensive definition of 'testimonial,'" it stated that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* Here, Lesa Garcia's statements were not testimony at a preliminary hearing, before a grand jury, or at a former trial. Nor were her statements given in response to police interrogations. Instead, Lesa made the statements to her co-workers and friends, Patricia Bach and Mary Pruski; and to her divorce attorney, Sara Herrmann. We, therefore, hold that these statements were not testimonial. Thus, Garcia's constitutional right to confrontation was not violated.

We overrule issues fourteen through sixteen.

▮▮ In his seventeenth issue, Garcia argues that the trial court erred in overruling his motion for mistrial. Specifically, Garcia complains of the following testimony by Sara Herrmann.

Q: And did you give Monica [Garcia's divorce attorney's legal assistant] the startling news that Lesa had been murdered?

A: Yes. I certainly did. I was concerned for my safety, as well as theirs.

Garcia then objected; his objection was sustained; and the trial court instructed the jury to disregard the answer. Garcia

then moved for a mistrial, which was denied.

We review a trial court's ruling on a motion for mistrial for abuse of discretion. *Archie v. State*, 221 S.W.3d 695, 699 (Tex.Crim.App.2007). Thus, we must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Id.* "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Id.* (quoting *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim.App.2004)).

On appeal, Garcia argues that the trial court's instruction to disregard did not cure the harm caused by Herrmann's statement because Herrmann's testimony "amounted to no more than an ungrounded conclusion that [Garcia] was guilty of the offense." Garcia also argues that the testimony attacks Garcia "over the shoulders of his counsel by implying that [his] attorney and staff might be in an oppositional stance." According to Garcia the "baseless implication that [Garcia]'s counsel—privy to [Garcia]'s secrets—might have had reason to fear him injected prejudice that could not be cured short of declaration of a mistrial." We disagree. We hold that the trial court's instruction to disregard cured any prejudice and that the trial court did not abuse its discretion in denying the motion for mistrial.

We, therefore, overrule Garcia's seventeenth issue.

In his eighteenth issue, Garcia argues that the trial court erred in overruling his motion for mistrial when Joan Wells testified about the "car dumping" incident. Joan Wells testified that she and Lesa Garcia discussed the "car dumping" incident. Wells then stated,

> I consider that to be a very dangerous incident, because [Loop] 1604 is—it's considered the death loop just on a traffic basis. People are injured, cars spin out of control, and she was a very young woman walking alone for over a mile and a half.

Garcia objected to hearsay, which was sustained. The trial court then instructed the jury to disregard. Garcia moved for a mistrial, which was denied. Garcia argues that the trial court's instruction did not cure the error. Again, we disagree and hold that the instruction cured the error. Therefore, the trial court did not abuse its discretion in denying the motion for mistrial.

In his nineteenth issue, Garcia argues that the trial court erred in overruling his objections to testimony regarding the security precautions taken by Laura Ellison, Lesa Garcia's supervisor, during the time period Garcia was served with divorce papers. Garcia objected to the testimony under rules 401, 403 and 404(b).[3] As noted previously, the court of criminal appeals has held that testimony relating to the nature of Garcia and Lesa Garcia's relationship is relevant and admissible under rule 404(b). *Garcia*, 201 S.W.3d at 703–04. This testimony about security measures taken during the serving of divorce papers relates to the nature of their relationship. Therefore, the testimony is relevant pursuant to rule 401 and admissible under rule 404(b). With regard to rule 403, Garcia argues that any relevance was "low" and that the danger of prejudice was "high" because the testi-

---

**3.** Garcia also mentions that this testimony was hearsay and violated the Confrontation Clause. However, Garcia does not adequately explain how this testimony was hearsay or how it violated the Confrontation Clause. Therefore, for purposes of the hearsay and Confrontation Clause issues, Garcia has inadequately briefed the issues. *See* Tex.R.App. P. 38.1(h).

mony implied "unproven prior bad acts leading to the establishment of the 'security measures.'" We disagree and hold that the danger of unfair prejudice did not *substantially outweigh* the probative value of the evidence.

■ In his twentieth issue, Garcia argues that the trial court erred in overruling his objections to Laura Ellison's testimony of a conversation she had with Lesa Garcia on the Friday before the murder. Ellison testified that she had overheard Lesa Garcia speaking on the telephone with Garcia. Immediately after Lesa Garcia ended the phone call, she came into Ellison's office. According to Ellison, Lesa Garcia was crying and very upset. Lesa Garcia told Ellison that she was "supposed to have the children that weekend, and she had planned to take them to the birthday party with her." Ellison testified that Lesa Garcia "was very upset because [Garcia] wouldn't let her have the children that weekend to take them to a birthday party they had." According to Ellison, Lesa said she then asked Garcia to take them to the party himself, but he refused.

Garcia argues that these statements were inadmissible hearsay. We disagree and hold that they were admissible as an excited utterance. *See* Tex.R. Evid. 803(2). Further, Garcia admits in his brief that the statements admitted through Ellison were cumulative. Thus, any error was harmless. *See Anderson v. State,* 717 S.W.2d 622, 628 (Tex.Crim.App.1986) ("Inadmissible evidence can be rendered harmless if other evidence at trial is admitted without objection and it proves the same fact that the inadmissible evidence sought to prove."); *Couchman v. State,* 3 S.W.3d 155, 160–61 (Tex.App.-Fort Worth 1999, pet. ref'd) ("It is well-established that the improper admission of evidence does not constitute reversible error if the same

facts are proved by other properly admitted evidence.").

■ Garcia also argues that because the testimony was irrelevant and thus of "low" probative value, its admission violated rule 403. According to Garcia, the statements were "completely irrelevant to any alleged motive or intent for the offense" and "were immensely prejudicial, precisely because, as they were not relevant to [Garcia]'s state of mind, they were merely an attack on character." We disagree. These statements, once again, relate to the nature of Garcia and Lesa's relationship. Thus, the statements were relevant and admissible under rule 404(b). *See Garcia,* 201 S.W.3d at 703–04. Being admissible under rule 404(b), they were not merely an attack on Garcia's character. Therefore, the trial court did not err in overruling Garcia's rule 403 objection.

■ Garcia also argues that the admission of these statements violated the Confrontation Clause. We disagree. Lesa Garcia made these statements to her supervisor after ending an upsetting telephone call with Garcia. *See Crawford,* 541 U.S. at 68, 124 S.Ct. 1354 (explaining that the term "testimonial" "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations"). We hold that the statements are not testimonial.

We, therefore, overrule Garcia's twentieth issue.

### EMAILS

■ At trial, Garcia attempted to introduce in evidence Defense Exhibit 42, a complete set of emails exchanged between him and Lesa Garcia from August 10, 1999, the day after he was served with divorce papers, to February 21, 2000, the Monday after the murder. Garcia also

attempted to introduce in evidence Defense Exhibits 44 to 50, which consisted of calendars depicting the months of August 1999 to February 2000. Garcia had noted on these calendars the days he had possession of the children. Attached to these calendars were the emails exchanged between Garcia and Lesa relating to the periods of possession of the children for that particular month. The State objected to all these exhibits, arguing that they were hearsay and not authenticated. The objection was sustained, and Garcia was not permitted to admit the exhibits containing the emails in evidence.[4] However, the calendars (without the attached emails) were admitted in evidence.

In issues twenty-one and twenty-two and in issues thirty-one and thirty-two, Garcia argues that the trial court erred in sustaining the State's objections to Defense Exhibits 42 and 44 to 50 as lacking authentication and being hearsay. However, even if the trial court erred in excluding these exhibits, we must disregard any error that is harmless. "When evaluating harm from non-constitutional error flowing from the exclusion of relevant evidence, we examine the record as a whole, and if we are fairly assured that the error did not influence the jury or had but a slight effect, we conclude that the error was harmless." *Ray v. State*, 178 S.W.3d 833, 836 (Tex.Crim.App.2005); *see also* TEX.R.APP. P. 44.2(b) ("Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."); *Reese v. State*, 33 S.W.3d 238, 243 (Tex.Crim.App.2000) (explaining that substantial rights are not affected by the erroneous exclusion of evidence if after

examining the record as a whole the court has "fair assurance that the error did not influence the jury, or had but a slight effect"). Further, if the excluded evidence is admitted through other testimony, a defendant is not harmed. *Roberts v. State*, 743 S.W.2d 708, 711 (Tex.App.-Houston [14th Dist.] 1987, pet. ref'd) (explaining that because "the State offered the very evidence appellant was seeking through its own witness," the appellant "was not harmed by the court's ruling"); *see also Easterling v. State*, 710 S.W.2d 569, 574 (Tex.Crim.App.1986); *Mowbray v. State*, 788 S.W.2d 658, 668 (Tex.App.-Corpus Christi 1990, pet. ref'd). Here, Garcia contends that the emails were offered to demonstrate the nature of his and Lesa's relationship and their respective states of mind during the divorce proceedings. Garcia emphasizes that the excluded emails provide an extensive amount of correspondence relating to the joint transportation of the children, and the extent to which Garcia and Lesa Garcia were cooperating and coordinating with one another to facilitate the children's schedules.

However, even assuming that the emails would have established what Garcia asserts, these issues were presented to the jury through other avenues. Garcia testified that he and Lesa were amicably settling their divorce and providing for the care of their children. Garcia gave the following example of their cooperation: when he missed his pistol, Lesa communicated that she had it and would be glad to return it to him; according to Garcia, she returned it "in good operating order." Sara Herrmann, Lesa's divorce attorney

---

4. At the time the objection was sustained, Garcia argued that by not permitting him to admit these exhibits in evidence, the trial court was denying him the right to present a defense as guaranteed by the Fifth, Sixth, and Fourteenth Amendments and by article 1, sections 10 and 19 of the Texas Constitution. He also argued that he was being denied his right to effective assistance of counsel, his right to due process, and his right to due course of law as guaranteed by the United States and Texas Constitutions.

confirmed that the divorce proceedings had gone smoothly, testifying that before the dispute over the $7500 in the brokerage account became an issue on the Thursday before the murder during the settlement conference, she had complimented both Garcia and Lesa for putting aside their personal differences on their financial issues and for thinking about the best interest of their children.

Garcia also testified that after their second separation he and Lesa communicated almost exclusively by email, that he had saved those emails, that they had an agreement regarding visitation of the children, and that the calendars he prepared accurately reflect that agreement and show periods of possession of the children. Those calendars prepared by him were allowed in evidence. Garcia then testified extensively about his and Lesa's coordination of the children's visitation through email. He also testified that they communicated via email regarding the care of their children and their medical issues.

Garcia further testified that he and Lesa used email to settle their divorce. According to Garcia, he and Lesa were "coordinat[ing] extensively through email" about the property division and had agreed to a division themselves in an effort to reduce legal fees. He testified that Lesa was "intimately familiar with" the amount contained in his brokerage account because she had "reviewed the statement, the monthly statements." And, he testified that the brokerage account was his separate property and that Lesa agreed, communicating to him via email that "it sounds like that account is yours."

He also testified that Lesa never said anything indicating she was afraid of him. Nor did her demeanor give the impression that she was afraid of him.

With regard to the weekend of the murder, Garcia was able to testify that he picked up the children on Friday night, spent all weekend with them, and dropped them off at day care on Monday morning. He also testified that he routinely dropped off the children on Mondays when he updated the medical sheets at the day care.

Therefore, we hold that even if the trial court should have admitted the defense exhibits at issue, any such error was harmless.

In issues twenty-three through thirty and issues thirty-three through forty, Garcia argues that by sustaining the State's objections to these defense exhibits, the trial court violated the following constitutional rights: (1) his state constitutional right to due course of law; (2) his state constitutional right to present a defense; (3) his state constitutional right to confront and cross-examine witnesses; (4) his state constitutional right to effective assistance of counsel; (5) his federal constitutional right to due process of law; (6) his federal constitutional right to present a defense; (7) his federal constitutional right to confront and cross-examine witnesses; and (8) his federal constitutional right to effective assistance of counsel. Thus, Garcia argues we should not apply the harmless-error standard in Texas Rule of Appellate Procedure 44.2(b) for non-constitutional errors, but should instead apply the harmless-error standard in rule 44.2(a) for constitutional errors.

 While the exclusion of a defendant's evidence can amount to a violation of a constitutional right, "not every erroneous exclusion of a defendant's evidence amounts to a constitutional violation." *Potier v. State*, 68 S.W.3d 657, 659 (Tex.Crim. App.2002). The Supreme Court has explicitly stated that there is no constitutional right to present favorable evidence. *See United States v. Scheffer*, 523 U.S. 303, 316, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998)

(explaining that a defendant is not denied "a fair opportunity to defend himself whenever a state or federal rule excludes favorable evidence"); *Potier*, 68 S.W.3d at 659. Thus, a defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions. *Potier*, 68 S.W.3d at 659. State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials so long as those rules are not arbitrary or "disproportionate to the purposes they are designed to serve." *Id.* According to the court of criminal appeals, Supreme Court precedent stands "for the limited proposition that certain egregious evidentiary errors may violate the Due Process Clause of the Fourteenth Amendment." *Id.* at 660. For example, a trial court, by applying a state rule that made a defendant incompetent to testify, and then allowing that defendant to make an unsworn statement to the jury without the assistance of counsel, violated the defendant's constitutional right to assistance of counsel and right to testify. *Id.* (citing *Ferguson v. Georgia*, 365 U.S. 570, 595–96, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961), and *Rock v. Arkansas*, 483 U.S. 44, 51, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987)). Also, a trial court that followed a state rule forbidding persons charged as principals, accomplices, or accessories to be witnesses for one another but allowed them to be witnesses for the State, violated a defendant's due process rights because the court denied the defendant evidence that was relevant, material, and vital. *Id.* (citing *Washington v. Texas*, 388 U.S. 14, 16, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)). According to the Court, the Constitution had been violated by such an "arbitrary rule." *Id.* (quoting *Washington*, 388 U.S. at 22, 87 S.Ct. 1920). Similarly, a trial court violated a defendant's due process rights by applying a state rule that prohibited *per se* the hyp-notically-refreshed testimony of a witness, and thus excluding the defendant's own testimony about the shooting of the victim, which the defendant claimed was accidental. *Id.* at 661 (citing *Rock v. Arkansas*, 483 U.S. 44, 57, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987)).

In *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), the Supreme Court also held that the application of a state hearsay rule may violate a defendant's right to confront witnesses. In *Chambers,* the defense was that another person had committed the offense; however, when the defendant called that person to the witness stand, the trial court enforced a state "voucher" rule, which prevented a party from impeaching his own witness, and the state's hearsay rule. *Id.* at 293–94, 93 S.Ct. 1038. As a result of the trial court's strict enforcement of these rules, the defendant "was unable either to cross-examine [the witness] or to present witnesses in his own behalf who would have discredited" the witness. *Id.* at 294, 93 S.Ct. 1038. The Court criticized the state's "voucher" rule, explaining that "[w]hatever validity [it] may have once enjoyed, and apart from whatever usefulness it retains today in the civil trial process, it bears little present relationship to the realities of the criminal process." *Id.* at 296, 93 S.Ct. 1038. The Court then criticized the state's hearsay rule for not recognizing an exception for declarations "that are against the penal interest of the declarant." *Id.* at 299, 93 S.Ct. 1038. The Court explained that the "hearsay statements involved in this case were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability." *Id.* at 300, 93 S.Ct. 1038. According to the Court, "[t]hat testimony also was critical to Chambers' defense. In these circumstances, where constitutional

rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id.* at 302, 93 S.Ct. 1038. The Court has since, however, emphasized the limited nature of this holding. *See United States v. Scheffer,* 523 U.S. 303, 316, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (emphasizing that *"Chambers* specifically confined its holding to the 'facts and circumstances' presented in that case" and that the ruling did not "signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures").

In *Potier v. State,* 68 S.W.3d 657, 659 (Tex.Crim.App.2002), the court of criminal appeals considered the above precedent by the Supreme Court and explained that "[t]hese cases show that the exclusion of relevant, material, important evidence by the application of particular rules that are arbitrary or disproportionate to their purposes may offend the Constitution." *Potier,* 68 S.W.3d at 662. However, "[t]hey also show that courts are free to apply evidentiary rules that are not arbitrary and unjustified." *Id.* Thus, under the particular facts presented in its case, the court of criminal appeals considered whether the erroneous rulings had "such a drastic effect as those in *Ferguson* (denial of defendant's right to testify under oath and with the assistance of counsel), *Washington* (denial of right to present vital evidence of a co-defendant), *Chambers* (denial of right to present vital, reliable hearsay evidence, combined with denial of right to cross-examine), or *Rock* (denial of the defendant's right to testify to vital evidence about the offense)." *Id.* at 665. The court of criminal appeals explained that "[t]hose defendants were effectively precluded from presenting a defense at all." *Id.* Thus, the court of criminal appeals held that "the exclusion of a defendant's evi-

dence will be constitutional error only if the evidence forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense." *Id.*

Since *Potier,* the court of criminal appeals has stated that "[t]here are two circumstances in which the improper exclusion of evidence may establish a constitutional violation: (1) when a state evidentiary rule categorically and arbitrarily prohibits the defendant from offering relevant evidence that is vital to his defense; or (2) when a trial court erroneously excludes relevant evidence that is a vital portion of the case and the exclusion effectively precludes the defendant from presenting a defense." *Ray v. State,* 178 S.W.3d 833, 835 (Tex.Crim. App.2005).

■ Neither circumstance applies here. Garcia's exhibits were not inadmissible because of a state evidentiary rule categorically and arbitrarily prohibiting him from offering the exhibits. And, the trial court's exclusion of the exhibits did not effectively preclude him from presenting a defense. Through his own testimony, Garcia was able to present his defense to the jury. Although the emails might have corroborated certain parts of his testimony, that fact does not make the emails such a vital portion of the case that their exclusion precluded him from presenting a defense.

Further, Garcia was able to fully cross-examine the State's witnesses. Garcia disagrees, arguing that the exclusion of the emails denied him his right to confront witnesses because had the emails been admitted, "he could in essence cross-examine the other witnesses against him who had been allowed to testify about Lesa's alleged statements to them." Such "impeachment," however, would be improper.

The witnesses he would be cross-examining had not made the statements in the emails. The witnesses were testifying about statements Lesa had made to them; they were not testifying about statements Lesa had made in emails to Garcia. Instead, once again, the emails would have been useful to Garcia as corroboration of his own testimony.

We, therefore, hold that the exclusion of the emails did not rise to constitutional dimension.

### JURY UNANIMITY

█ In issues forty-one through forty-three, Garcia argues that the trial court erred in overruling his requested instruction for a charge on jury unanimity; and in overruling his request for separate verdict forms for each application paragraph. In issues forty-four through forty-six, Garcia argues that the trial court violated his state constitutional right to a unanimous jury verdict, his state constitutional right to due course of law, and his federal constitutional right to due process by overruling his requested instruction and his request for separate verdict forms for each application paragraph.

Garcia was charged by a two-count indictment. Paragraph A of Count I alleged that he intentionally and knowingly caused the death of Lesa Garcia by strangling her with his hand, a ligature or an unknown object, that in the manner of its use and intended use was capable of causing death and serious bodily injury. Paragraph B of Count I alleged that intending to cause serious bodily injury to Lesa Garcia, Garcia committed an act clearly dangerous to human life, to wit: strangling Lesa Garcia with his hand, a ligature or an unknown object, that in the manner of its use and intended use was capable of causing death and serious bodily injury, and did cause Lesa Garcia's death. Paragraph A of

Count II alleged that Garcia intentionally and knowingly caused the death of Lesa Garcia by striking her with and against an unknown object, that in the manner of its use and intended use was capable of causing death and serious bodily injury. Paragraph B of Count II alleged that intending to cause serious bodily injury to Lesa Garcia, Garcia committed an act clearly dangerous to human life, to wit: striking Lesa Garcia with and against an unknown object, that in the manner of its use and intended use was capable of causing death and serious bodily injury, and did cause Lesa Garcia's death. The jury charge tracked the language of the indictment, instructing the jury if it found either of the four above scenarios to be true beyond a reasonable doubt, it should find Garcia guilty. According to Garcia, this instruction created the possibility of a non-unanimous verdict.

█ When assessing a jury unanimity challenge, we examine the plain language of the relevant statute. *Jefferson v. State*, 189 S.W.3d 305, 311 (Tex.Crim. App.), *cert. denied*, —— U.S. ——, 127 S.Ct. 386, 166 L.Ed.2d 276 (2006); *Yost v. State*, 222 S.W.3d 865, 877 (Tex.App.-Houston [14th Dist.] 2007, pet. ref'd). The purpose of this inquiry is to determine whether the legislature has created a single offense with multiple or alternate methods of commission. *Jefferson*, 189 S.W.3d at 311. Jury unanimity is required with respect to all essential elements of the offense at issue; however, the jury generally need not unanimously agree on the specific method of committing a single offense. *Id.*; *Yost*, 222 S.W.3d at 877.

The relevant provisions of the murder statute, section 19.02 of the Texas Penal Code, state the following:

A person commits an offense if he:

(1) intentionally or knowingly causes the death of an individual; [or]

(2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. . . .

TEX. PEN.CODE ANN. § 19.02(b)(1)-(2) (Vernon 2003).

A plain reading of this statute reveals that the two provisions at issue differ in their descriptions of the mental state required for culpability. *Compare* TEX. PEN. CODE ANN. § 19.02(b)(1) (requiring mental state of intentionally or knowingly), *with id.* § 19.02(b)(2) (requiring intentional conduct). However, these two provisions have been held by the Texas Court of Criminal Appeals to constitute alternative manner or means of committing the offense of murder. *Aguirre v. State,* 732 S.W.2d 320, 326 (Tex.Crim.App.1982); *Yost,* 222 S.W.3d at 876. Thus, whether the jury determined that Garcia intentionally or knowingly caused the death of Lesa Garcia, or that he caused her death by committing an act clearly dangerous to human life with the intent to cause serious bodily injury, there was only one single crime of murder. *See Ortiz v. State,* No. 05–05–01527–CR, 2007 WL 520496, at *5 (Tex. App.-Dallas 2007, pet. filed). As a result, the instant case does not present the possibility of a less than unanimous conviction due to the alleged commission of multiple crimes or acts.

Further, murder is a result-oriented crime, *Cook v. State,* 884 S.W.2d 485, 490 (Tex.Crim.App.1994), and the law demands jury unanimity with respect to certain elements, *Stuhler v. State,* 218 S.W.3d 706, 718 (Tex.Crim.App.2007). Specifically, at a minimum, the jury must reach unanimous agreement on the following components of murder: "the subject (the defendant); the main verb; and the direct object if the main verb requires a direct object (i.e., the offense is a result-oriented crime)." *Stuhler,* 218 S.W.3d at 718. In applying these principles to the instant case it is clear that, under any of the possible scenarios contained in the court's charge, the jury would still have been unanimous insofar as it determined that Garcia caused the death of an individual, Lesa Garcia. Therefore, there is not a possibility of a non-unanimous verdict.

And, contrary to Garcia's contentions, "jurors are not required to agree on the defendant's specific mental state; rather, they need only agree that defendant possessed one of the alternate mental states that satisfy the element of intent under the statute." *Yost,* 222 S.W.3d at 877; *see Ortiz,* 2007 WL 520496, at *6 ("[I]t would be absurd to find error in this case because six jurors may have believed appellant knowingly or intentionally shot and killed Sanchez, while six other jurors may have believed that he intended to cause Sanchez serious bodily injury and shot him four times, killing him."). The murder statute enumerates alternative manner and means of committing the crime of murder. While the conduct under the provisions may be different, the legislature did not intend to create distinct and separate offenses. *See Gandy v. State,* 222 S.W.3d 525, 529 (Tex.App.-Houston [14th Dist.] 2007, pet. ref'd) (analyzing the murder statute and noting that it is common practice for the legislature to set forth alternate manner and means of committing a given offense by using the preparatory phrase "a person commits an offense if . . ." and concluding that while the conduct under the provisions of the murder statute might be "distinctly different," "the three methods of committing murder set forth in the statute are different manner and means of committing the same offense, not distinct and separate offenses"). Further, as has been estab-

lished, the law does not demand jury unanimity with respect to the manner and means of a given offense. *Jefferson*, 189 S.W.3d at 311.

Therefore, the trial court did not err, and Garcia's constitutional rights were not violated. We overrule issues forty-one to forty-six.

### REASONABLE DOUBT INSTRUCTION

In issues forty-seven and forty-eight, Garcia complains that the trial court erred (1) in denying his requested instruction defining "reasonable doubt"; and (2) in overruling his objection to the failure of the jury charge to contain an instruction defining "reasonable doubt." In issues forty-nine to fifty-one, Garcia argues that the trial court violated his right to due process of law, his constitutional right to jury unanimity, and his state statutory right to jury unanimity, because it failed to include in its jury instructions a definition of the term "reasonable doubt."

Garcia admits that in *Paulson v. State*, 28 S.W.3d 570, 573 (Tex.Crim.App.2000), the Texas Court of Criminal Appeals overruled that portion of *Geesa v. State*, 820 S.W.2d 154 (Tex.Crim.App.1991), that required trial courts to instruct juries on the definition of "beyond a reasonable doubt." Nonetheless, Garcia argues that *Paulson* was wrongly decided. However, whether *Paulson* was wrongly decided is an issue for the Texas Court of Criminal Appeals, not this court. *Paulson* held because a reasonable doubt instruction is neither constitutionally nor statutorily required, "the better practice is to give no definition of reasonable doubt at all to the jury." *Paulson*, 28 S.W.3d at 573. We are bound by that holding. Therefore, we overrule issues forty-nine through fifty-one.

In issues fifty-two and fifty-three, Garcia argues that the trial court erred "by including a portion of the *Geesa* rea-

sonable doubt instruction in the jury charge over appellant's objection that the charge did not define 'reasonable doubt'" and that the trial court committed fundamental error by including a portion of the *Geesa* "reasonable doubt" instruction in the charge.

In his brief, Garcia admits that he did not object to the language about which he now complains. Instead, he requested a reasonable doubt instruction. Nonetheless, he argues that while he "should have more specifically objected, the objection was clearly sufficient to put the court on notice that [he] was objecting to the incomplete definition." We disagree and hold that his objection was not sufficient. Therefore, any error by the trial court would not be reversible unless Garcia suffered egregious harm. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1985). Errors that result in egregious harm are those affecting the "very basis of the case," those depriving the defendant of a "valuable right", or those that "vitally affect [a] defensive theory." *Id.* at 172.

However, we first determine whether error exists. Garcia complains of the following instruction:

The prosecution has the burden of proving the defendant guilty and it must do so by proving each and every element of the offense charged beyond a reasonable doubt and if it fails to do so, you must acquit the defendant.

*It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution's proof excludes all "reasonable doubt" concerning the defendant's guilt.*

In the event you have a reasonable doubt as to the defendant's guilt after considering all the evidence before you, and these instructions, you will acquit

him and say by your verdict "Not guilty."

(emphasis added).

For support, Garcia cites *Rodriguez v. State*, 96 S.W.3d 398, 405 (Tex.App.-Austin 2002, pet. ref'd), and *Phillips v. State*, 72 S.W.3d 719, 721 (Tex.App.-Waco 2002, no pet.), which both held that the above language taken from *Geesa* constituted charge error. However, in *Ochoa v. State*, 119 S.W.3d 825, 829 (Tex.App.-San Antonio 2003, no pet.), this court disagreed with the analysis of both *Rodriguez* and *Phillips* and instead adopted the rationale by the First Court of Appeals in *Carriere v. State*, 84 S.W.3d 753, 759 (Tex.App.-Houston [1st Dist.] 2002, pet. ref'd), which held that the language at issue did not constitute a definition of reasonable doubt and therefore did not violate *Paulson*. Following our holding in *Ochoa*, we hold that the trial court did not err by including the above language in the charge.

We, therefore, overrule issues fifty-two and fifty-three.

### IMPROPER ARGUMENT

In issues fifty-four to sixty, Garcia argues that, during closing argument, the trial court erred in overruling his objection to the prosecutor's improper argument.

■ Proper jury argument must fall within one of four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement. *Guidry v. State*, 9 S.W.3d 133, 154 (Tex.Crim.App. 1999). Error exists when facts not supported by the record are interjected in the argument; however, such error is not reversible unless, in light of the record, the argument is extreme or manifestly improper. *Id.* Moreover, an instruction given to the jury to disregard the prosecutor's

statement generally cures any error. *See id.*

■ First, Garcia complains that the prosecutor improperly argued Lesa Garcia was expecting Garcia on the Sunday night in question. The prosecutor's argument, however, was a reasonable deduction from the evidence. *See Vaughn v. State*, 607 S.W.2d 914, 922–23 (Tex.Crim.App.1980) (explaining that during argument, counsel may "draw from those facts in evidence all inferences that are reasonable, fair, and legitimate and that he has wide latitude without limitation in this respect so long as the argument is supported by the evidence and offered in good faith"). There was testimony that Garcia typically took the children to Lesa Garcia's home on Sunday evenings. Further, there was no forced entry into Lesa Garcia's home and a bag of children's clothes was left on the kitchen counter. There was testimony that Lesa Garcia kept a very tidy home and that she would not have left a bag of dirty clothes on the kitchen counter.

■ Second, Garcia also complains that the prosecutor argued that Garcia "routinely returned his children to Lesa on Sunday evening." This statement was also a reasonable deduction from the evidence. Even Garcia admits in his brief that he "on occasion returned his children to Lesa on Sunday afternoons." Laura Jacobs, Lesa's sister, testified that Garcia would return the boys to Lesa's house on Sunday evenings. There was also testimony from the day-care workers that Garcia rarely dropped off his children on Monday mornings.

■ Third, Garcia complains that the prosecutor argued that as Garcia was driving back to his parents' home on the Sunday night in question, he avoided the "dinger" "either by yanking it out of the way or circumventing it in some way" and

then went inside his trailer. The prosecutor then reminded the jury that at three o'clock in the morning on the night in question, Ben Hicks saw a vehicle enter the family compound and heard a door open and close. These statements by the prosecutor were also a reasonable deduction from the evidence. There was testimony that it was possible to avoid the dinger. Ben Hicks testified that at approximately 3:00 a.m. on the night in question, he saw headlights that traveled to Garcia's trailer. He heard a door open and close. When he asked one of his friends who was driving the car, his friend replied, "Oh, it's just my uncle."

██ Fourth, according to Garcia, the prosecutor improperly argued that Garcia, being an engineer, needed everything to be in its place and that because Lesa Garcia did not follow his plans, she infuriated him over the course of the marriage. An example given by the State was her refusal to "go out and live in the compound." These statements are also a reasonable deduction from the evidence. There was evidence that although Garcia wanted to build a home on the family compound, Lesa Garcia refused. This issue was one that came up repeatedly during their marriage counseling sessions. Garcia testified that he wanted to move out to the family compound because he thought "it would be best for us to move out there." However, Lesa Garcia refused, which Garcia testified he "didn't think [ ] was a good decision." And, there was evidence that Garcia was frequently angry with Lesa Garcia. When Garcia was served with divorce papers, he said, "That bitch is going to pay." There was also evidence that Lesa Garcia told her friends that she was afraid of Garcia.

██ Fifth, Garcia complains the State argued that because he was infuriated by Lesa Garcia's request for $7,500, he retaliated by demanding custody and refusing to allow the children to go with Lesa Garcia to a birthday party on the weekend in question. Again, the prosecutor's statements were a reasonable deduction from the evidence. There was evidence that Garcia was agitated when Lesa Garcia's attorney made the demand of $7,500 from the brokerage account. Lesa Garcia then told her attorney that she was afraid of Garcia again. There was also testimony that after the demand for the $7,500, Garcia, for the first time, requested custody of the boys. And, there is evidence that Lesa Garcia told her friend that Garcia had told her over the phone that he was not going to allow her to have the children that weekend for the purpose of taking them to a birthday party.

Sixth, Garcia complains that the prosecutor argued that although Garcia "knew full well that Lesa smoked and drank on occasion, yet insinuated the mystery killer left behind cigarettes and Zima bottles." That Garcia knew that Lesa Garcia smoked and drank on occasion is supported by the evidence. Garcia testified that Lesa had been a smoker and would "drink from time to time." The State's argument about the "mystery killer" was an answer to argument of opposing counsel. The defense's theory of the case was that Lesa Garcia had a boyfriend who had murdered her. Thus, the defense called Garcia's sister who testified that when she entered Lesa Garcia's home after the murder, she found female suppository contraceptives, edible underwear, a vibrator, and condoms in Lesa's bedroom. She also testified that she found men's clothing in her dresser, including a male G-string with the word "Chippendales" on it. The defense also called Nelson Sigoloff, Garcia's brother-in-law, who testified that in Lesa Garcia's garage he found trash bags with "a bunch of cigarette butts and Zima bottles."

Thus, the defense argued that there was someone else in Lesa's home on the night of the murder.

 Seventh, Garcia complains of the following argument by the prosecutor: "Please ladies and gentlemen, don't let the truth be another victim in this case. He did it, he knows it, and so do you." According to Garcia, this argument is improper because the prosecutor interjected her personal opinion.

 A prosecutor may not convey to the jury during argument that she possesses specialized knowledge or expertise about a contested factual issue in the case. *Jackson v. State,* 17 S.W.3d 664, 675 (Tex. Crim.App.2000). Such comments pose a danger of influencing the jury's opinion in deciding the issue. *Id.* In evaluating whether the prosecutor interjected her personal opinion into the argument, we must consider the challenged remark in the context in which it appears. *Id.*

Here, the prosecutor's statements were not conveying to the jury that she had specialized knowledge or expertise about a factual issue. The prosecutor merely argued that Garcia was guilty, an argument supported by the evidence.

 Moreover, even if the prosecutor's statements could be construed as stating that, in her opinion, Garcia is guilty, a prosecutor may argue her opinions concerning issues in the case so long as the opinions are based on the evidence in the record and do not constitute unsworn testi-

mony. *Penry v. State,* 903 S.W.2d 715, 756 (Tex.Crim.App.1995). Thus, the court of criminal appeals has held that a prosecutor did not improperly interject his personal opinion by arguing he believed the defendant was guilty because his belief was "based on the evidence he brought forth in trial." [5] *Id.* Here, the prosecutor's statements were based on the evidence produced at trial and do not constitute unsworn testimony. Thus, the argument was not improper.

 In issue sixty-one, Garcia complains of the following argument by the prosecutor during the punishment phase of trial:

State: I want you to think back [to] what you heard during the guilt/innocence phase of the trial. And I want you to think back to the defendant's demeanor when he took the stand during the guilt/innocence phase of the trial. I want you to ask yourselves if you saw in that defendant any hint of remorse. Because remorse is the first step in taking responsibility.

Defense: Objection, Your Honor. The defendant is not required, in the guilt/innocence phase, for the jury, to express remorse. He's pleading he's not guilty. It's improper argument and counsel knows that.

Court: All right. Move on. Overrule.

On appeal, Garcia argues that the State's argument was a comment on his

---

**5.** Specifically, the prosecutor argued the following:

> If you think he is not guilty, then, you can go back there and write on that line, not guilty. I, never in my life have I stood before a jury and said that, but, I feel that confident. I feel that strong about this case, and I am biased, I will tell you that right now, I am biased. I was in Livingston on October 25, 1979. I am very biased,

> and I want you to know it. I am an advocate, I represent the State of Texas in this case, and I came into this case believing that he was guilty. I came into this case with one thought in mind, and that is to present evidence to you so that you would be as convinced as I am of the guilt of this. . . .

*Penry,* 903 S.W.2d at 756.

failure to testify during the punishment phase of trial in violation of the Fifth and Fourteenth Amendments to the United States Constitution, Article I, section 10, of the Texas Constitution, and article 38.08 of the Texas Code of Criminal Procedure. Garcia, however, has failed to preserve this issue for appeal.

■ An "appellate court may not fault the trial court on the basis of arguments not presented to the trial court." *Wead v. State*, 129 S.W.3d 126, 129 (Tex.Crim.App. 2004). Thus, in *Wead v. State*, the court of criminal appeals held that a defendant who objects at trial "to the attack on the defendant as improper argument" cannot argue for the first time on appeal that the prosecutor's comment amounted to a comment on his failure to testify. *Id.* at 128, 130. According to the court, the defendant's objection at the trial court, when read in context, "appeared to be that the prosecutor was commenting improperly on appellant's courtroom appearance or demeanor." *Id.* However, such an objection does not preserve on appeal the issue of whether the prosecutor commented on the defendant's failure to testify. *Id.* Thus, "the court of appeals erred in even considering appellant's argument that the prosecutor's comment amounted to a comment on appellant's failure to testify, since appellant made no such argument in the trial court." *Id.*

Similarly, here, Garcia objected at trial that the prosecutor's argument was improper because "[t]he defendant is not required, in the guilt/innocence phase, for the jury, to express remorse." This objection is not sufficient to preserve the issue of whether the prosecutor's argument amounted to a comment on Garcia's failure to testify during the punishment phase. *See id.*

We overrule issues fifty-four to sixty-one.

## PROSECUTORIAL MISCONDUCT

In issues sixty-two and sixty-three, Garcia argues that he was denied his right to a fair trial as guaranteed by the United States and Texas Constitutions by virtue of repeated prosecutorial misconduct. He complains of various alleged acts of misconduct by the prosecutors and points to his issues ten through seventeen and fifty-four to sixty-one to support his allegations. We, however, overruled all these issues. And, in reviewing the record, we disagree that Garcia was denied a fair trial. Thus, we overrule issues sixty-two and sixty-three.

## PREJUDICE BY TRIAL COURT

In issue sixty-four, Garcia argues that he was denied his right to a fair trial as guaranteed by the United States and Texas Constitutions because the trial court was prejudiced against him. And, in issue sixty-five, Garcia contends that the trial court erred in overruling his motion for new trial based upon the denial of his right to a fair trial because of the trial court's bias.

In his motion for new trial, Garcia argued that the trial judge has biased in favor of the prosecution and against him as shown through the trial judge's "tone of voice, demeanor, facial expressions, and attitude." Because of these accusations, the trial judge recused himself from hearing the motion for new trial, and the Honorable James Barlow, sitting by designation, heard the motion. At the hearing, Garcia introduced affidavits in evidence and presented testimony from four witnesses: Michelle Parish, Garcia's cousin; Elizabeth Sinclair, also Garcia's cousin; Bridgette Zertuche, who attended church with Garcia's sister; and Warren Weber, a defense witness who watched the trial after he had been released from the invoca-

tion of the rule. According to these defense witnesses, the trial judge's tone of voice and demeanor was harsh toward the defense but was polite toward the prosecution. Garcia complains that the trial judge rushed the defense, but gave the prosecution leeway. He even complains that when the trial judge instructed the jury that nothing he said or did was to be interpreted by the jury as an indication of his attitude toward one side or the other, his tone was insincere. And, Garcia points to an incident where the trial judge, in response to repeated objections by the State, some of which he sustained and some of which he denied, stated, "Sustained. You know, as my mom used to say, don't make me come down there." Defense counsel then replied, "I'm sorry, Judge?," to which the judge replied, "Don't make me come down there." Garcia argues that the judge's comment "was not funny and was intimidating."

At the motion for new trial hearing, the State also introduced supporting affidavits and the testimony of Mary Green, the prosecutor at trial. Green testified that the "as my mama" comment was said in a "light manner" and that defense counsel responded with a chuckle and a comment excusing himself. Thus, Green believed that when the trial judge made the comment, he was joking. According to Green, the trial judge often tries to alleviate courtroom tension through humor. And, although the trial judge did show some aggravation during trial, Green believed that his aggravation was "directed at both sides of the courtroom." And, according to Green, not only was the trial judge's conduct professional but it "was warranted on occasion."

 With regard to issue sixty-four, Garcia argues that the trial judge's conduct amounted to structural error. Judicial bias is structural error and is not subject to harmless error review. *Arizona v. Fulminante*, 499 U.S. 279, 309–10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

 However, while judicial bias is structural error, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion," and opinions that a judge forms during trial do not necessitate recusal "unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). "Thus, judicial remarks during the course of trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id.* Moreover, "expressions of impatience, dissatisfaction, annoyance, and even anger" do not establish bias or partiality. *Id.* at 555–56. And, a "judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Id.* at 556. Thus, we do not believe that the record shows that the trial judge's tone, demeanor, attitude, and facial expressions amounted to structural error.

 With regard to Garcia's sixty-fifth issue, we review a trial court's ruling on a motion for new trial under an abuse of discretion standard of review. *Webb v. State*, 232 S.W.3d 109, 110 (Tex.Crim.App. 2007). Under this standard of review, we view the evidence in the light most favorable to the trial court's ruling and uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Id.*; *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim.App.2004). We do not substitute our judgment for that of the trial court but instead consider whether the trial court's decision was arbitrary or unreasonable. *Webb*, at 110; *Wead*, 129 S.W.3d at 129. Thus, a trial court abuses its discretion in

denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling. *Webb,* at 110.

█ Here, Mary Green's testimony alone supports the trial court's ruling. Thus, we hold that the trial court did not abuse its discretion in denying Garcia's motion for new trial.

### CONCLUSION

Having now considered and overruled all issues, we affirm the judgment of the trial court.